

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CRH:ICR/JEA                    *271 Cadman Plaza East*
F. #2020R00508                 *Brooklyn, New York 11201*

December 9, 2022

<u>By Hand and ECF</u>

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

    Re:  United States v. Colinford Mattis
       <u>Criminal Docket No. 20-203 (BMC)</u>

Dear Judge Cogan:

    The government respectfully submits this memorandum in advance of the sentencing hearing in this case for defendant Colinford Mattis ("Mattis"), which is currently scheduled for December 16, 2022. For the reasons detailed below, the government respectfully submits that the Court should sentence Mattis to a term of 18 to 24 months' imprisonment. (Revised Presentence Investigation Report ("Revised PSR") ¶ 4).

    I.  <u>Facts</u>

    The Revised PSR accurately describes the offense conduct in this case. <u>See</u> Revised PSR ¶¶ 7-35. On May 25, 2020, Minneapolis Police Department Officer Derek Chauvin, a white man, murdered George Floyd, an African American man, by kneeling on his neck and asphyxiating him for nine minutes while arresting him for using counterfeit U.S. currency. George Floyd's murder by a police officer galvanized large nationwide protests focused on police brutality against African Americans.

    As outlined in the Revised PSR, in group chats on the evening on May 28, 2020, co-defendant Urooj Rahman ("Rahman") sent a message to various individuals, including Mattis, to announce a protest at the Barclays Center in Brooklyn that was planned for the evening of May 29, 2020. In the early morning hours of May 29, 2020, just hours after the Minneapolis Third Precinct stationhouse was overrun and burned by rioters, Mattis and Rahman used a separate group chat to discuss the use of weapons and violence to pursue social change. In their discussion, Rahman expressed the view that "all the police stations" and "probably all the courts" "need[ed]" to be burned down.

    Over the course of the evening, Rahman and Mattis sent many group chat messages in which they, among other things: discussed the burning of Minneapolis's Third Precinct;

expressed support for burning police stations and One Police Plaza, the headquarters of the NYPD[1]; detailed acts of violence and property damage targeting the NYPD, including the use of fireworks and Molotov cocktails (improvised incendiary devices) to set fires[2]; encouraged others to engage in violence[3]; mocked reportedly injured police officers; and disparaged law enforcement generally, writing "Fuck 12"[4] and referring to police officers as "pigs."

At one point, Mattis, who was not with Rahman at the time, indicated that he wanted to meet up with her to participate in the events she was reporting to the group. Mattis announced he would stop by a gas station for supplies en route to meeting up with Rahman, referring to the purchase of gasoline that could be used to burn additional NYPD vehicles. Rahman reported to Mattis and others that rioters were attempting, once again, to set fire to an NYPD van, and that projectiles and gasoline to set more fires were needed.

Shortly before 11:00 PM, Rahman and Mattis began messaging with each other one-on-one. Mattis thereafter attempted to purchase gasoline at a Mobil gas station on Conduit Boulevard. That gas station had closed, so Mattis proceeded to a second gas station on Atlantic Avenue. Mattis purchased a red gas can and a few gallons of gasoline. Thereafter, while Mattis made his way to meet Rahman, Rahman sent messages to the group chat asking for information about which Brooklyn NYPD precincts were still under siege from rioters. Just before midnight, Mattis met up with Rahman in the vicinity of a 7-Eleven convenience store on the Flatbush Avenue Extension where they purchased two six-packs of Bud Light glass beer bottles and toilet paper for use in building Molotov cocktails.

Rahman and Mattis then made the two-mile drive, in a minivan driven by Mattis, to the NYPD's 88th Precinct Stationhouse on the corner of Classon Avenue and Dekalb Avenue

---

[1]	In one exchange, after Rahman had sent a video of a crowd surrounding a burned-out NYPD van, Mattis stated to Rahman to "Go burn down 1PP" and offered to send her the address, which he did along with the location in a link to Google Maps.

[2]	Rahman stated "[T]hrowing bottles and tear gas... lit some fires but were put out... fireworks goin and Molotovs rollin." Rahman also sent the group chat photographs depicting a group of rioters damaging and burning a marked NYPD van in the vicinity of Fort Greene Park, and videos showing firefighters arriving to extinguish the flames. In another exchange, Mattis responded to a video sent by Rahman of a group of people surrounding a damaged and burned-out NYPD van, stating "[b]ring it to their neck." In others, Rahman described throwing a rock at the NYPD van, and she and other members of the group chat celebrated reports that the NYPD had been forced out of the 88th Precinct stationhouse.

[3]	Rahman sent a video of rioters standing in Fort Greene Park on the embankment above Dekalb Avenue pelting NYPD officers with projectiles while Rahman can be heard yelling "Keep throwing at 'em." After sending the video to the group, Rahman announced with a smiley face emoji that her rock had struck a police officer.

[4]	The phrase "Fuck 12" is a derogatory anti-police slogan equivalent to "Fuck the police."

in Brooklyn. There, Mattis's minivan stopped on the street in front of a parked NYPD sedan, specifically a 2013 Ford Fusion hybrid bearing NYPD auxiliary livery, which had been significantly damaged by a crowd marching down Dekalb Avenue earlier in the evening (the "NYPD sedan"). When Mattis's minivan pulled up to the NYPD sedan, a few civilians were in the area taking photographs of the damaged NYPD sedan and other vehicles on the street. One of those individuals ("Witness-1") was recorded by an NYPD surveillance camera at the 88th Precinct taking a photograph of the NYPD sedan as Mattis's minivan approached it shortly before 1:00 AM on May 30, 2020.

According to Witness-1, Mattis's minivan pulled up near him as he was taking photographs of vehicles on the street. Both the driver, Mattis, and the passenger, Rahman, spoke to Witness-1 and coaxed him to throw a bottle that Rahman was holding. Witness-1 declined, and instead took three photographs of the pair and later reported the incident to the police. Witness-1 provided the three photographs to law enforcement, which depict Rahman holding a Molotov cocktail in her right hand, with Mattis partially visible behind her in the driver seat.

Mattis's minivan returned to the NYPD sedan at approximately 1:00 AM. Rahman got out of the front passenger seat of Mattis's minivan and ignited the Molotov cocktail. A second later, with at least two other people in the immediate vicinity of the NYPD sedan, Rahman threw the lit Molotov cocktail through the smashed window of the NYPD sedan, starting a small fire in the center console of the NYPD sedan, before she ran back to Mattis's waiting minivan. Mattis then drove the minivan away at a high rate of speed while the center console of the NYPD sedan began to burn. Within two minutes, responding police officers extinguished the flames.

The defendants were arrested a short time later on Eastern Parkway in Brooklyn. Photos of Mattis's minivan taken by the NYPD after Mattis and Rahman's arrests show a completed Molotov cocktail comprised of a 12-ounce bottle of Bud Light filled with gasoline and a toilet paper wick sitting on the front passenger seat of Mattis's minivan with two lighters, two open bottles of Bud Light on the floor of the front passenger seat in a cardboard six-pack container, and a third open Bud Light bottle lying on the floor next to the container. Officers also observed a funnel in the glove box. In the rear of Mattis's minivan, police officers found a half-full red gas can, a Poland Spring water jug half-filled with a brown liquid, several rolls of toilet paper, and several more Bud Light bottles. The defendants were charged shortly thereafter.

On October 20, 2021, the defendant pleaded guilty pursuant to a plea agreement to Count Seven of the indictment, which charged him with knowingly receiving, possessing, and making an improvised incendiary device which was not registered to the defendants in the National Firearms Registration and Transfer Record, in violation of 26 U.S.C. §§ 5861(d) and 5861(f). Revised PSR ¶ 1. On June 3, 2022, the defendant pleaded guilty to a superseding information, which charged the defendant with conspiracy to commit arson and to make and possess an unregistered destructive device, in violation of 18 U.S.C. § 371. Revised PSR ¶ 3.

II.     Applicable Law

Title 18, United States Code, Section 3553(a) requires a sentencing court to "determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' to achieve the overarching sentencing purposes of 'retribution, deterrence,

incapacitation, and rehabilitation.'" Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903 (2018) (quoting 18 U.S.C. § 3553(a) and Tapia v. United States, 564 U.S. 319, 325 (2011)). "[I]n determining the particular sentence to be imposed" the Court is required to consider both the sentencing factors set forth at § 3553(a)(2), as well as the sentencing range established by the Sentencing Commission for the applicable category of offense and offender. See 18 U.S.C. § 3553(a)(4). Thus, "[a] district court is procedurally obligated to calculate and consider the Sentencing Guidelines in reaching an independent decision as to sentence," United States v. Awan, 607 F.3d 306, 312 (2d Cir. 2010), and "[a] district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range," which "provide the 'starting point and the initial benchmark' for sentencing." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting Gall v. United States, 552 U.S. 38, 49-50 (2007)).

Although the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") are advisory, see United States v. Booker, 543 U.S. 220 (2005), "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)" in determining what sentence to impose, see United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Thus, while a district court retains wide discretion in sentencing a defendant, that discretion applies not to the calculation of the Guidelines but rather to the subsequent decision whether "to deviate from the Guidelines once properly ascertained." See United States v. Thomas, 628 F.3d 64, 71 (2d Cir. 2010); accord, e.g., United States v. Dorvee, 616 F.3d 174, 180 (2d Cir. 2010) ("Once the proper Guidelines sentence has been ascertained, a sentencing court should consider the § 3553(a) factors to determine whether a non-Guidelines sentence is warranted.").

III.    Sentencing Guidelines

Applying the U.S. Sentencing Guidelines Manual to the facts detailed above, the government, the defendant and the Probation Department have each independently determined that the applicable Guidelines range for the defendant is 60 months' imprisonment. As part of his plea agreement, the defendant stipulated to the Guidelines calculation set forth below.

The government submits that the Revised PSR sets forth the applicable Guidelines calculation, which is reflected below:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2K2.1(a)(5)) | 18 |
| Plus: Offense Involved Destructive Device (U.S.S.G. § 2K2.1(b)(3)(B)) | +2 |
| Plus: Used or Possessed Firearm In Connection With Another Felony Offense (U.S.S.G. § 2K2.1(b)(6)(B)) | +4 |

| | |
|---|---|
| Plus: Terrorism Enhancement (U.S.S.G. § 3A1.4(a)) | +12 |
| Less: Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Less: Acceptance of Responsibility (U.S.S.G. § 3E1.1(b)) | <u>-1</u> |
| Total: | 33 |

Revised PSR ¶¶ 39-57. The defendant does not have any prior criminal convictions, and thus his criminal history category would ordinarily be set at Category I, but under Section 3A1.4, the defendant's criminal history category is automatically set at Category VI. <u>See</u> U.S.S.G. § 3A1.4(b). At Criminal History Category VI, an offense level of 33 carries an advisory Guidelines sentencing range of 235 to 293 months in custody, but because the minimum of the applicable sentencing range exceeds the statutorily authorized maximum sentence of five years' imprisonment for the defendant's offense of conviction, the statutorily authorized maximum sentence of 60 months' imprisonment is the advisory Guidelines sentence.[5] <u>See</u> U.S.S.G. § 5G1.1(a).

As part of his plea agreement, the defendant has stipulated to this calculation, and waived any right to a hearing regarding the Probation Department's Guidelines determination. (<u>See</u> Plea Agreements ¶ 2; Revised PSR ¶ 4.) The defendant also stipulated as part of his plea agreement to the application of the Guidelines' Section 3A1.4 enhancement. <u>See</u> Plea Agreement ¶ 2. The Probation Department likewise determined in the PSR that Section 3A1.4 applies to the defendant's conduct. That enhancement applies because the defendant's offense of conviction—conspiracy to commit arson and to possess and create unregistered Molotov cocktail improvised incendiary devices—involved two felony offenses enumerated at 18 U.S.C. § 2332b(g)(5)(B): (1) conspiracy, attempt and use of a weapon of mass destruction, in violation of 18 U.S.C. § 2332a; and (2) attempted arson of property used in and affecting interstate commerce, in violation of 18 U.S.C. § 844(i), and because the evidence set forth above demonstrates that the defendants' conduct was calculated to influence or affect the conduct of the NYPD and New York City government and/or to retaliate against the NYPD and the City of New York for the NYPD's performance of its duty to maintain and restore order during the protests and to cause the City to order the NYPD to retreat from the streets. In the alternative, the defendant's conduct was intended to promote a crime enumerated at 18 U.S.C. § 2332b(g)(5)(B). In any event, however, the sentence recommended by the government is lower than the Guidelines calculation without the Section 3A1.4 enhancement, therefore the Court need not determine whether the enhancement applies.[6]

---

[5] The Guidelines would still advise a sentence of 60 months' imprisonment even if the defendant's criminal history category were set at Category I, because even at Category I, offense level 33 carries a Guidelines sentencing range of 135 to 168 months' imprisonment, and thus the minimum of the Guidelines range would still be above the statutorily authorized maximum sentence.

[6] In <u>Crosby</u>, the Second Circuit observed that there may be cases in which a sentencing court "makes a decision to impose a non-guidelines sentence, regardless of which of

IV.     The 18 U.S.C. § 3553(a) Sentencing Factors

The defendant's targeting of NYPD property with homemade firebombs is extremely dangerous criminal conduct that warrants a serious sentence. Both in selecting an appropriate charge to resolve this prosecution by plea agreement, and in recommending an appropriate sentence, the government has given careful consideration to the full range of aggravating and mitigating factors that the Court must consider at sentencing under 18 U.S.C. § 3553(a). Particularly in this case, which presents numerous facts and circumstances that could reasonably be viewed as both mitigating and concerning, the government is mindful of the Second Circuit's guidance that "'facts may frequently point in different directions so that even experienced district judges may reasonably differ, not only in their findings of fact, but in the relative weight they accord competing circumstances.'" United States v. Broxmeyer, 699 F.3d 265, 289 (2d Cir. 2012) (quoting United States v. Jones, 531 F.3d 163, 174 (2d Cir. 2008)).

Based on the unique set of facts and circumstances presented in this case, the government is confident that the statutory range of zero to 60 months' imprisonment for the defendant's violations of 18 U.S.C. § 371, affords the Court sufficiently broad discretion to select and impose sentences that serve the statutory purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2). In the government's view, and for the reasons discussed below, the government respectfully submits that a sentence of 18 to 24 months' imprisonment, below the Guidelines sentence of 60 months' imprisonment, would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a).

A.     The Nature and Circumstances of the Offense

A sentence of 18 to 24 months' imprisonment would accurately reflect the seriousness of the defendant's conduct in creating Molotov cocktails that were used by Rahman, with Mattis' direct assistance, to firebomb an NYPD vehicle. Here, Mattis and Rahman acquired the components to build a Molotov cocktail destructive device. Specifically, Mattis went to two different gas stations to obtain a gas can and gasoline, and then to a 7-Eleven, with Rahman to acquire Bud Light bottles to use as a vessel for the gasoline and toilet paper to use as a wick to ignite it. Mattis and Rahman constructed Molotov cocktails and first attempted to distribute one to Witness-1 and encouraged him to use it against the NYPD sedan, before doing so themselves. This is particularly relevant to this defendant's sentencing since, while Rahman ultimately threw the incendiary device the ignited the police vehicle, Witness-1 indicated that Mattis (as well as Rahman) attempted to instigate this person to commit this serious crime.

Mattis and Rahman had also built a second Molotov cocktail and were equipped with the components to make several more when they were arrested, thus indicating that their arrests had disrupted a plan to cause even more extensive damage. The fact that Mattis and his co-

---

two [Guidelines] ranges applies." 397 F.3d at 112. In such cases, although the government must inform the court of the applicable Guidelines range, if relevant facts that would affect the Guidelines calculation are contested by the defendant, the court need not resolve such factual disputes if it determines that a non-Guidelines sentence is warranted under 18 U.S.C. § 3553(a). Id.

defendant were arrested and prevented from continuing their attacks on NYPD property does not mitigate their conduct.

Second, the defendant's weapon of choice—fire—presented a particularly severe risk of danger because she could not control who or what would be harmed by the fire once set. Mattis and Rahman could not know whether the NYPD sedan contained within it combustible or explosive materials, such as ammunition. Nor could they foresee or control the damage that a spreading fire would cause once set. As evident in the surveillance video, when Rahman attempted to light it on fire the NYPD sedan was parked near several other vehicles, directly under the boughs of a large tree, and at least two other people were near the sedan. Had the NYPD not quickly extinguished the flames, the fire could easily have spread, causing more damage to property and threatening human life.

## B. The History and Characteristics of the Defendant

Like his co-defendant Rahman, assessing Mattis's history and characteristics presents a uniquely difficult task for the government in recommending sentence, and ultimately for this Court in selecting the sentence to impose, because the relevant facts and circumstances point in sharply opposite directions that are difficult to reconcile. Indeed, the defendant's history and characteristics present at least two highly significant mitigating factors:

First, the government's investigation has not revealed evidence that before May 29, 2020, the defendant had ever used, attempted, planned, or advocated the use of violence, intimidation or coercion to affect or retaliate against government conduct.

Second, the defendant has successfully completed advanced degrees, and recently entered a profession that offered a future of gainful and meaningful employment. The government has no contrary evidence or reason to dispute the additional information provided by defense counsel regarding the defendant's pro bono and public interest contributions as an attorney and counselor-at-law to underserved communities and indigent clients. Nor does the government dispute that Mattis's decision to adopt his own foster mother's foster children, and to care and provide for them as his own, is a mitigating factor on which this Court is entitled to place significant weight.

But these factors can also be viewed as troubling.

First, the speed with which the defendant acted on his motivations and made the decision to engage in serious criminal conduct is both surprising and concerning. Indeed, it is both unusual and deeply troubling that Mattis mobilized to commit violent acts targeting law enforcement in a few hours, without having previously expressed any interest in participating in violent activity targeting law enforcement.

Second, in choosing to commit serious crimes, Mattis cast aside his ties and responsibilities to his community, family and profession with little apparent thought for the severe consequences of that decision. Any person's decision to violate the law and engage in criminal conduct is wrong and worthy of punishment, but it is troubling as an attorney licensed by the State

of New York.  Even more significantly, his crime involved targeting a law enforcement agency charged with enforcing the same law that, as an attorney, he had sworn to uphold.

C.       The Purposes of Sentencing

The government respectfully submits that a sentence of 18 to 24 months in the custody of the Attorney General is necessary to reflect the seriousness of the defendant's offense, to promote respect for the law, and provide just punishment.  See 18 U.S.C. § 3553(a)(2)(A).  The defendant's criminal conduct is extremely serious.  Mattis's decision to make and use firebombs to target NYPD property created a severe risk of danger and could easily have resulted in the destruction of more property and harm to human life.

There remains the risk that the mix of factors that led the defendant to build firebombs to be used to be thrown at an NYPD sedan will reoccur, and that others will follow the defendant's example and use force against law enforcement and other government officials in an effort to coerce government conduct.  In the Court's consideration of both specific and general deterrence, sentencing Mattis within a range of 18 to 24 months' imprisonment will afford adequate deterrence by discouraging others from engaging in similar conduct and sending a message that the law views these crimes seriously.  See 18 U.S.C. § 3553(a)(2)(B).

The government also believes that a sentence of 18 to 24 months' imprisonment is a punishment substantial enough to assure that the defendant will not re-offend.  See 18 U.S.C. § 3553(a)(2)(C).  While there are aspects of Mattis's conduct that raise serious concerns about his risk to re-offend, Mattis's acceptance of responsibility, expression of remorse, and agreement to make restitution to the NYPD by paying an amount equal to the replacement value of the NYPD sedan, suggests that his arrest and conviction has at least partially mitigated the risk of future dangerousness.

Finally, a sentence of 18 to 24 months' imprisonment is broadly consistent with similar sentences imposed for similar offense conduct committed during civil disorder.  See 18 U.S.C. § 3553(a)(6); see also United States v. Robinson, et al., No. 20-CR-181 (D. Minn.) (Four defendants were convicted of conspiracy to commit arson, in violation of 18 U.S.C. § 371, for their roles in the arson of the Minneapolis Police Department's Third Precinct on the night of May 28, 2020.  The defendants were sentenced to 48 months', 41 months', 36 months', and 27 months' imprisonment based on their respective levels of involvement it the attack.); United States v. David-Pitts, 20-CR-143 (W.D. Wa.) (the defendant was convicted of conspiracy to commit arson, in violation of 18 U.S.C. § 371, for his role in starting a fire against a police precinct door to prevent police officers from exiting the precinct.  The defendant was sentenced to 20 months' imprisonment.); United States v. Jackson, 20-CR-148 (W.D. Wa.) (Defendant was convicted of two counts of unlawfully possessing Molotov cocktails in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(8) and sentenced to 40 months' imprisonment.  The defendant created and used two Molotov cocktails against Seattle Police Department vehicles during a protest on May 30, 2020.).

The government recognizes that the most similar sentence for similar offense conduct the Court can consider is the 15 month sentence imposed by the Court of Mattis' co-defendant Rahman.  See ECF No. 108.  The government agrees that this sentence merits significant

weight, but the government respectfully submits that its recommended sentencing range of 18 to 24 months remains appropriate for this defendant, given the factors discussed above. In addition, the government considers Mattis's conduct here as equally culpable to Rahman's conduct, and thus the Court should not go below a 15-month sentence. While Rahman did throw the Molotov cocktail into the NYPD vehicle, Mattis provided all of the resources to build the Molotov cocktail, built two Molotov cocktails, drove to the 88th Precinct to conduct the attack, and he made the ultimate decision to join Rahman not to participate in the protests but instead to participate in the violence. Indeed, as is reflected in the communications, Mattis turned down the opportunity to participate in the civil protest as he had responsibilities at home; it was only when he learned that Rahman was with a crowd burning police cars that he made the decision to join Rahman. In contrast to Rahman – who started out participating in a lawful protest that became a riot – Mattis only decided to come after the conduct turned destructive and unlawful.

The defendant's reliance on United States v. Carberry, et al., No. 20-CR-544 (S.D.N.Y.) as an analogous case is misplaced. In Carberry, two defendants set fire to an NYPD van in July 2020 and were sentenced to 6 months' imprisonment. There, the sentencing record in Carberry was entirely devoid of any evidence that the defendants planned the arson attack before they set the van on fire. See 20-CR-544, ECF No. 77. Even more, the defendant and Rahman not only methodically collected components to make a destructive device, but actually constructed at least two, and offered one to a witness to throw at the NYPD sedan before Rahman threw the Molotov cocktail and set fire to the NYPD sedan. Moreover, in contrast to Carberry, Mattis and Rahman's targeting of the NYPD happened in the midst of an active protest, creating a more severe situation for law enforcement, emergency personnel and others in the area.

The government also requests that the Court, consistent with the plea agreement, impose restitution in the amount of $30,137.00, which was the total cost to the NYPD of acquiring the NYPD sedan, including outfitting the vehicle with specialty police equipment.

V.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court sentence Mattis to a below-Guidelines term of 18 to 24 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

By:    /s/_____
Ian C. Richardson
Jonathan E. Algor
Assistant U.S. Attorneys
(718) 254-7000

cc:    Clerk of Court (BMC) (by Hand and ECF)
Shayna Bryant, Senior United States Probation Officer (by Email)
Sabrina Shroff, Esq. and Adam Margulies, Esq. (counsel to defendant Mattis) (by ECF and Email)