| | |
|---|---:|
| **SABRINA P. SHROFF** | 80 BROAD STREET, 19ᵀᴴ FLOOR |
| ATTORNEY AT LAW | NEW YORK, NEW YORK 10004 |
| | TELEPHONE: (646) 763-1490 |

December 14, 2022

**BY ECF AND E-MAIL**
Honorable Brian M. Cogan
United States District Judge for
 the Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    <u>United States v. Colinford Mattis,</u>
           20 Cr. 203-1 (BMC)

Dear Judge Cogan:

       In Mr. Mattis's main submission we explained why a sentence of time served is sufficient in this case. The government's sentencing submission does not show otherwise. Instead, it largely recycles its analysis of the 18 U.S.C. § 3553(a) factors that it applied to Ms. Rahman. But Mr. Mattis is not Ms. Rahman. The history and characteristics of the two are simply not the same and they should thus be afforded individualized consideration at sentencing. See *id.* § 3553(a)(1). Ironically, where the government purports to distinguish between Mr. Mattis and Ms. Rahman in certain areas, it does so in a way that misstates the record and invites unwarranted and improper inferences. In light of the section 3553(a) factors that apply specifically to *Mr. Mattis*, a sentence of time served with an additional year of home confinement and other conditions is sufficient but not greater than necessary to achieve the goals of sentencing.

    **I.**    **The Government's Submission Does Not Adequately Individualize Mr. Mattis's Personal Circumstances or the Nature and Circumstances of His Offense.**

       The government's sentencing submission does not adequately address Mr. Mattis's unique personal circumstances; at times it simply gets them wrong. In a single sentence, the government states that Mr. Mattis's "decision to adopt his own foster mother's foster children, and to provide for them as his own, is a mitigating factor on which this Court is entitled to place significant weight." ECF 113 at 7. First, the three children were under Mr. Mattis's mother's foster care; Mr. Mattis was raised by his biological mother.

       The government goes on to omit something critical: it is not just Mr. Mattis's *past* decision and child care that is entitled to considerable weight at sentencing. It is also the *future* care of his children—and, specifically, Mr. Mattis's unique role in providing that care (*see* J. Alleyne, Ex. S-2; Exs. 2, 3, 6, 9–18 to Mr. Mattis's main submission)—that is deserving of section 3553(a) consideration. *See United States v. Greene*, 249 F. Supp. 2d 262, 266 (S.D.N.Y. 2003); *see also* PSR ¶ 118. A sentence of incarceration, let alone the period of 18 to 24 months' incarceration requested by the government, would afford no weight to this consideration. By contrast, a sentence of time served and additional home confinement (for a total of three and a half years' confinement) would allow the three children to remain a family.

Hon. Brian M. Cogan  December 14, 2022
Eastern District of New York  Page 2

In an attempt to obtain the same sentence (or higher) for Mr. Mattis as it did for Ms. Rahman, the government also makes flawed and inaccurate assertions concerning Mr. Mattis's conduct. We correct them now.

The government erroneously contends that it is *aggravating* that Mr. Mattis "turned down the opportunity to participate in the civil protest" earlier in the afternoon on May 29, 2020. ECF 113 at 9. In the government's view, Mr. Mattis thereby rejected an opportunity to join Ms. Rahman in lawful civil protests and instead only wanted "to participate in the violence." *Id.*

*First*, Mr. Mattis did not decline an invitation to join what were merely lawful protests on the afternoon of May 29, 2020. In fact, Mr. Mattis, as the chats show, declined to join any protest. The individual in the group chat who asked Mr. Mattis and others if they were planning to protest (prompting Mr. Mattis's no) had, just minutes earlier, texted, "I'm ready to start setting precincts on fire like they did in Minneapolis." Ms. Rahman replied, "Seriously, that's what needs to happen… all of them." A third individual added, "burn it down." Mr. Mattis opened these messages, read them, and said, "I'm not going. That's not my lane and there is a global pandemic afoot." Clearly, Mr. Mattis turned down the opportunity to participate in *destructive* acts of protest. While Mr. Mattis later joined in the destructive conduct, the fact that Mr. Mattis said "that's not my lane," underscores the aberrant nature and comparably short duration of his crime.

*Second*, the government also strains the record in stating that Ms. Rahman—purportedly in contrast to Mr. Mattis—"started out participating in a lawful protest that became a riot." ECF 113 at 9. This ignores that this Court found that Ms. Rahman began protesting with a "predisposition" to engage in the offense conduct, and that her relevant conduct was a "pretty full day . . . like 24 hours." Rahman Sentencing Tr., Ex. S-17, at 30, 32. The Court's finding that Ms. Rahman's conduct was the "natural culmination of where she started that morning," an "aggravating factor[]" (*id.* at 33), is simply inapplicable to Mr. Mattis. Mr. Mattis affirmatively declined to join in the protests in the afternoon on May 29, 2020, and maintained that position for hours after Ms. Rahman first started reporting to the group that the protests had turned violent. The fact that Mr. Mattis joined Ms. Rahman in the offense conduct hours after she had been engaging in destructive acts of protests is a distinction that supports a finding of lesser aggravation, not greater aggravation, here.

*Third*, the government perplexingly argues that the shorter duration of Mr. Mattis's offense conduct should be considered an aggravating factor, given the "*speed* with which [Mr. Mattis] acted on his motivations." ECF No. 113 at 7 (emphasis added). We are not aware of any reason why the limited timeframe of Mr. Mattis's aberrant conduct should be viewed as aggravating rather than mitigating.[1] The government seeks to have it both ways, with Ms. Rahman's conduct deemed aggravating due to its more extended duration, and Mr. Mattis's conduct deemed aggravating due to its more limited duration. The government's request to adopt such a "heads I win, tails you lose" approach should be rejected. *See United States v. Mattis*, 963 F.3d 285, 294 (2d Cir. 2020)

---

[1] To the extent the government suggests that Mr. Mattis's allegedly rapid change of course is "concerning" (*id.* at 9) because it reflects a heightened risk of reoffending, we have addressed in our main submission the factors precipitating that change of course and Mr. Mattis's commitment to rehabilitation, among other reasons why specific deterrence is not a concern here.

(rejecting, in context of bail appeal, the government's "'heads I win, tails you lose' zero-sum analysis.").

The government's sentencing submission also elides other material distinctions between Mr. Mattis and Ms. Rahman. Perhaps most significantly, the government does not mention that Mr. Mattis did not throw rocks at police officers or otherwise engage in conduct that was directly intended to cause physical harm to officers. The government's silence regarding this distinction is notable, given this Court's finding that such conduct was "as bad as throwing the Molotov cocktail." Ex. S-17 at 31; *see* PSR ¶¶ 15, 19.

The government further states that, "While Rahman did throw the Molotov cocktail into the NYPD vehicle, Mattis . . . built two Molotov cocktails." *Id.* at 9. The government's suggestion is that Mr. Mattis built the Molotov cocktails on his own, but we are aware of no evidence (nor does the government cite any) to support such an assertion. More generally, the government's reliance on the fact that Mr. Mattis engaged in some conduct (picking up supplies and driving) that was different from Ms. Rahman's conduct is misplaced. The question is not whether Mr. Mattis did anything differently than Ms. Rahman—the question is whether the differences that exist between Mr. Mattis's conduct and Ms. Rahman's conduct, viewed in their totality, support a conclusion that their conduct should be treated identically. For all the reasons stated above and in our main submission, the various differences that exist between Mr. Mattis's conduct and Ms. Rahman's conduct militate in favor of a lower sentence for Mr. Mattis.

## II. General Deterrence Does Not Require an Incarceratory Sentence.

The government argues that its requested sentence is necessary to achieve general deterrence. *See* ECF 113 at 8.

First, while the Court may consider general deterrence as a sentencing factor under section 3553, it should not be afforded significant weight here in light of the nature of the crime. Destructive acts of protests are typically committed, as they were here by Mr. Mattis, in the heat of societal upheaval and under extreme emotional and psychological circumstances (including social pressures). Such crimes are typically not committed by those engaged in the type of rational cost-benefit analysis that general deterrence assumes. *Cf. United States v. Johnson*, No. 16-CR-457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) (noting that "[t]he need for general deterrence is particularly acute in the context of white-collar crime," given that such crimes "are more rational, cool, and calculated than sudden crimes of passion or opportunity").

Second, and relatedly: reliance on general deterrence is generally informed, in part, by the view that, at the time of the offense, a person is acting less out of anger and more out of "enthusiasm and being caught up in something." Ex. S-17 at 31; *see also id.* at 30 ("It seemed like you were having a pretty good time at the time . . . . *That makes i[t] more serious to me*." (emphasis added)); *id.* at 12–13 ("it almost seems like she's displaying proudly that t-shirt"). In particular, this Court noted that it needed to send a message to people who can "slip into the *same kind of mentality* that [Ms. Rahman] did" and who would wear light punishment as a "badge of honor." *Id.* at 37 (emphasis added). The texts and photographs specific to Mr. Mattis, however, do not give rise to any such inference. This is not to say that destructive acts done in anger or despair are

acceptable—of course they are not, and should be punished. But, that does not mean that the differences between Mr. Mattis's and Ms. Rahman's mental states should be ignored when determining the weight afforded to general deterrence.

General deterrence also should not be afforded weight to the exclusion of other sentencing factors, including factors unique to Mr. Mattis. With respect to Mr. Mattis's children in particular, Mr. Mattis recognizes that it is his own actions that have risked their continuum of care, and that he alone bears that responsibility. Nevertheless, we respectfully submit that Mr. Mattis's personal circumstances and the other section 3553 factors, including general deterrence, would all be served by an additional year of confinement to Mr. Mattis's home, where Mr. Mattis can continue to care for the children and proceed with their pending adoptions. A sentence of twelve months on home confinement—meaning about forty months' home confinement total—together with being a felon and being disbarred could never be viewed as a slap on the wrist by those who might otherwise consider engaging in destructive protests.

### III.     The Government's Comparable Case Analysis Is Flawed.

Beyond the government's flawed consideration of this Court's November 18 sentencing, the government continues to rely on cases involving far more egregious conduct, committed by defendants who generally had significant criminal records. *See* ECF 113 at 8. As detailed in our main submission, these cases involved the successful burning of a police station, resulting in a loss amount *400 times* greater than the loss amounted stipulated here; a defendant who traveled hundreds of miles to attempt to burn down a police station and trap officers inside; and a defendant who had numerous prior felony convictions and three pending burglary cases when he threw Molotov cocktails at two police cars, an act he planned a full day in advance. *See* ECF No. 111 at 17–18. These cases are not remotely comparable to this one, either in terms of conduct or criminal history. *See* 18 U.S.C. § 3553(a)(6) (need to avoid unwarranted sentence disparities is among "defendants with similar records who have been found guilty of similar conduct").

The government's proffered differences between this case and *Smith and Carberry* (ECF 113 at 9) are also misplaced, especially when compared to the glaring differences between this case and those the government relies upon. *First*, the mere fact that the government in *Smith and Carberry* did not rely on text messages does not mean that Smith and Carberry did not plan their actions. Smith and Carberry, who similarly pleaded guilty to conspiracy (which of course requires sufficient planning to form an agreement), presumably did not decide to set fire to an NYPD vehicle using a bottle filled with accelerant—and then set fire to it again—without any advance discussion. *Second*, although Smith and Carberry did not construct two separate devices, they did engage, unlike here, in two separate acts of arson. *Third*, the fact that Smith and Carberry burned the police car two months after the George Floyd protests does not render their conduct safe for firefighters and bystanders, and should be viewed as more blameworthy than the conduct here, which occurred in heat of unprecedented civil disorder soon after George Floyd's murder.

The government also fails to address the myriad other differences between this case and *Smith and Carberry* that support a lower sentence here. *See* ECF No. 111 at 16–17. In short, while no two cases are identical, *Smith and Carberry* is a more apt comparator than the cases relied upon by the government, and the differences that do exist between these two cases, considered in their

Hon. Brian M. Cogan                                                                    December 14, 2022
Eastern District of New York                                                                       Page 5

totality, counsel in favor of a sentence of time served here. Furthermore, the government offers no response to the other comparable cases cited in Mr. Mattis's main submission in which courts concluded that an incarceratory sentence was unnecessary. *See* ECF No. 111 at 17. The sentences imposed in these cases provide yet additional support for the proposed sentence here.

## I.     CONCLUSION

For all of the foregoing reasons, and those stated in our main submission, the Court should impose a sentence of time served, to be followed by one year of supervised release, subject to the requested conditions of home confinement, restitution, community service, and treatment for alcohol abuse and mental health.

Dated:  December 14, 2022
            New York, New York

                                                                    Respectfully submitted,

                                                                    /s/ Sabrina Shroff
                                                                    Sabrina Shroff
                                                                    Adam Z. Margulies
                                                                    *Counsel for Mr. Colinford Mattis*