**List of Supplemental Appendices and Exhibits**[1]

| SUPPLEMENTAL APPENDIX A:  Letters of Support | |
|---|---|
| **Adult Family** | |
| Ex. S-1. | Ebanks, Evelyn |
| **Children's Counselor** | |
| Ex. S-2. | Alleyne, Jennifer |
| **Friends** | |
| Ex. S-3. | Gooding, Chetney |
| Ex. S-4. | Gooding, Patricia |
| Ex. S-5. | Jeannot, Kenny |
| **Educators** | |
| Ex. S-6. | Gottlieb, Christine |
| Ex. S-7. | Guggenheim, Martin |
| Ex. S-8. | Law, Sylvia |
| Ex. S-9. | Sprigman, Christopher |
| **Recovery** | |
| Ex. S-10. | Racz, Diane |
| SUPPLEMENTAL APPENDIX B:  Audio Files — Extended Family from Jamaica | |
| Ex. S-11. | Crowe, Vira |
| Ex. S-12. | Ebanks, Charmaine |
| Ex. S-13. | Ebanks, Deita |
| Ex. S-14. | Ebanks, Loris |
| Ex. S-15. | Jackson, Puszie |
| Ex. S-16. | Parchment, Merle |
| SUPPLEMENTAL APPENDIX C:  Cited Sentencing Transcripts | |
| Ex. S-17. | *United States v. Rahman*, No. 20 Cr. 203-2 (BMC) (E.D.N.Y. Nov. 18, 2022) |

[1] These materials comprise additional letters of support that we have received since our main submission was filed.  We also enclose six audio files (totaling less than five minutes) from Mr. Mattis's extended family in Jamaica who preferred to provide voice notes.  We are filing these materials unredacted under seal because they contain references to information covered by Federal Rule of Criminal Procedure 49.1(a)(3) and (a)(5), and this Court's November 4, 2022 Order.  We will file a version of these materials redacting such information on the public docket.

**Exhibit S-1**

Hon. Judge Brian Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

December 12, 2022

Dear Judge Cogan:

I am writing this statement in support of my nephew Colin Mattis.

My name is Evelyn Ebanks; I am the younger sister of the late Edith Mattis, Colin's mum.

I worked for the British government for nearly 26 years as a caregiver and support worker but am now retired.

I have been a big part of Colin's and his siblings' lives since birth due to remaining very close to his late mother even though I live in Manchester, England.

We have spent several holidays together throughout his life whether there in NY or in our hometown of Jamaica.

From a young child Colin was always aware of how it was to live in poverty and surviving with very little, but his mother always managed to feed and clothe her children regardless.

Having been raised in a humble household only encouraged Colin to work harder throughout his schooling and further education to eventually bring his family out of the poverty situation they were in.

Colin's hard work and dedication never went unnoticed as he was awarded an honors and scholarship to go to a prestigious university to study law which he passed successfully.

This was a prime example of someone having a tough life with nothing, to dedicating himself to achieving and turning life around for himself and his family which he worked endlessly and tirelessly for regardless of obstacles in his way.

Colin plays a big role in family life supporting his siblings Doreen, Ernie and Lyris financially, emotionally and mentally, being there for each and every one of them in some way.

This shows as when his mother passed away he took on the responsibility of her three foster children where he raises them as his own inside his home ensuring they are raised in a warm stable family environment.

Due to Colin's actions, all three children were able to stay together rather than being split and ending up back into the care system; he ensures they have a good education and are thoroughly provided for.

1

He is also a huge part of the church community ensuring his children have a good Christian upbringing.

Colin plays a large role in work and family life due to his passion and persistence to thrive. His family are extremely dependent on him and also extremely proud of the man he has become today. Except for what he did the night he put himself in all of this trouble, he has been an exceptional young man and role model for youngsters.

Colin's late mother, Mrs. Edith Mattis, was extremely proud of Colin throughout her life and put her faith in him to look after and raise her foster children, which he is doing successfully. We ask that my nephew please be given the chance to continue with L███, S███ and A██.

Sincerely,

/s/ Evelyn Ebanks

# Exhibit S-2

Jennifer Alleyne
P.S. 202
982 Hegeman Avenue
Brooklyn NY, 11208

December 12, 2022

Honorable Judge Brian M. Cogan
United States District Court
Eastern District of New York

Dear Judge Brian M. Cogan,

My name is Jennifer Alleyne, I am the school counselor for P.S. 202. Mr. Mattis is the Parent of both S█████ and I██████. Over the last few years, we have communicated about his children's academic, social, and emotional successes and needs. He has always been easily accessible, present, helpful, willing, and knowledgeable. He has demonstrated a keen understanding of not only their needs but who I█████ and S████ are as children. He has participated in ███████████ ███████████ meetings, the middle school articulation process and parent teacher conferences.

When you speak with Mr. Mattis about the girls, he discusses their present abilities and what they need to be successful in the future. As an educator, it is encouraging to engage with parents who are willing and able to do the necessary "work" needed to help ensure that their children are well rounded and feel supported. I█████ and S████ adore, depend, and need Mr. Mattis. He is the constant parent in their lives. He has not only shown up as their rock / grounding place, but he is like their own personal superhero.

It would be unimaginable to think of the lives of I█████ and S████ without Mr. Mattis.

Sincerely,
Jennifer Alleyne

# Exhibit S-3

Hon. Judge Brian Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

December 12, 2022

Dear Judge Cogan:

I am a New York City born and raised fine arts painter from East New York, Brooklyn. I have known Colin today for 31 years now—and I'm 32, so that's basically my whole life. I heard that a week after I was born, Colin was at my house to help babysit. So I can personally tell you that what my best friend did in May 2020 is not a reflection of his true character. Since we were kids in the 90s, Colin has *always* been there for his family and friends because that's just who he is and what he stands for the most.

I remember when we were younger, our parents could never keep us apart for more than a day. Even if I had a lot of homework or chores to do around the house, Colin would stay and help me finish so I wouldn't be left out of having fun. Mrs. Mattis, Colin's mother, God bless her soul, used to cook us food whenever we were playing games at his house across the street for the evening, and vice versa if we would be at my house.

What I came to realize about Colin was there was nothing you could do to stop him from achieving his goals in life. I remember him calling me saying he had a bunch of full paid scholarships for the biggest colleges. I knew he was going to be a big part of our community and a role model to plenty once we grew up. I admired his plan to try to change the world for the better, for example with his great plans of bettering education and going to work for Teach for America in New Orleans a few years after Hurricane Katrina happened.

I say all this today so you understand who Colin is and why he is loved and appreciated by so many people. I'm praying and asking today that you only impose the minimum sentence upon Colin with the time he already served on house arrest. I strongly believe Colin deserves a second chance so he can continue to contribute to society what he really does best and has been doing for as long as I know him: help people, care for people, and last but not least love people.

Sincerely,

Chetney Gooding

Chetney Gooding

1

# Exhibit S-4

Hon. Judge Brian Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

December 12, 2022

Dear Judge Cogan:

My name is Patricia Gooding and I have known Colin Mattis, better known to his close family and friends as "Terrance," for the majority of his life. Terrance lived across the street from my home in East New York. He and my son, Chetney Gooding, were almost the same age and quite inseparable as kids. Terrance was at my house every day after school and the kids played together, laughed together, and we shared meals together and so forth.

Terrance is a very honest individual who has achieved quite a bit for a kid coming from East New York. From an academic standpoint, Terrance has overachieved. Many kids wish to attend Ivy League schools. For Terrance, coming from a poor family and the poor neighborhood, to achieve what he has is a great honor.

Terrance has always been a very humble individual. He never let achievements change who he was as a person and that's what I loved about him. He never forgot where he came from and continued to help people who were not as privileged, because he knew what it's like to be in that situation. His mother was always a hard working individual who instilled in Terrance her honesty, her love and her ability to care for needy kids. She used to take them into her home and foster them and give them the love and support they needed to become productive young men and women.

Because of the caring environment he was raised in, Terrance channeled that nurturing instinct to his foster brothers and sisters when his mum sadly passed away. He had a choice to live in a better neighborhood but chose to return home so that the kids his mum was fostering could have a chance at being with a family who had always cared for them—if this doesn't describe the character of the person Terrance is I don't know what will.

We all make mistakes in life, and I hope that this one mistake he made doesn't shadow the person he truly is. He is not a cruel person, but a loving, caring individual who has accomplished so much and has yet so much more to give to society. Your honor, I hope that this testament gives you some perspective of the exceptional person I see Terrance Mattis to be.

Sincerely,

Patricia Gooding

# Exhibit S-5

Hon. Judge Brian Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

December 11, 2022

Dear Judge Cogan:

My name is Kenny Jeannot.  I'm an educator, community leader and girls' basketball coach based in New York.

I work out of two schools, a middle school located in downtown Manhattan called Lower Manhattan Community and my former high school called School of the Future. I work for an educational non-profit called Connective Inc. where we focus on empowering the youth all across America. This program was started by my basketball coaches and a few alumni.

I mention this because if it wasn't for Colin I wouldn't even consider wearing any of these titles.

I met Colin through my cousin. It was during a time my cousin was fighting leukemia. I went to visit him 4 to 5 times a week at Tisch Cancer Institute at Mount Sinai in the Upper East Side of Manhattan. Colin also came to visit multiple times a week. We crossed paths when we visited at the same time.

My cousin and Colin grew up together and they talked about their times as youngsters in Brooklyn. My cousin often spoke about how Colin was a protector and very family oriented like myself. He hated bullies and always wanted to help people who are defenseless. Although Colin is smaller in stature than my cousin now, my cousin often reminded me that Colin was once bigger than him.

The chemotherapy barely kept my cousin awake so when he would fall asleep, that's when me and Colin connected.

He was attending NYU while doing and attending a bunch of different community building activities and events. He was meeting with people high up the political ladder and he was making sure that the people in our community had a voice to represent them.

Colin barely spoke about his accomplishments. I would hear about the things he was doing through my cousin and my uncle. It was hard to keep up with everything he was doing. I just thought it was amazing how this guy who was doing all these things made time to stop by a few times a week to see a sick friend. That spoke volumes to me about his character and his priorities—he was grounded, humble, and was always in service of others. He always asked me how I was doing, how I was feeling, how my family was. He would check in on me mentally and I appreciated that.

From where I see it Colin since he was young has helped many people as he can and protected them. Once I started coaching middle school girls' basketball Colin was excited for me and I

1

didn't get to thank him but because of our conversation about taking on leadership roles, that gave me the motivation to want to help my community and family like Colin. He would say things like "the world needs more leaders like you" or say things like "Those kids are in good hands." Colin motivated me to be and do better, and his confidence in me was very good for my energy.

I had a hard upbringing growing up in foster care feeling unwanted, unloved, and unnoticed. That pain turned into anger and I found it hard to want to be part of society.  It felt like anything I did, didn't matter because it wasn't enough.  Colin reminded me that because I went through what I went through, I had the upper hand when it comes to getting through to the youth or anybody else that went through similar situations than me.  Before working with the youth, I was just trying to figure out what my purpose was in life.  Colin helped me find one.

Last time I saw Colin we went to see my cousin, who is now a cancer survivor, perform at his show. My cousin told me that Colin had lost his mother and I just lost my father a year before. When I saw him I said my condolences and he quickly returned it and we just hugged and embraced each other.

He told me how he was now a father taking in the kids that his mother fostered. I thought to myself that if I was a kid I would love to have Colin as my dad. He's loving, understanding, knowledgeable, protective and is a provider. He will make sure that these kids are 100% prepared to be successful in life through education.

I say this because we always looked at Colin as the kid who made it, a kid from Brooklyn that saw everyone go left and he kept right. From the Ivy League to NYU, it was rare to see that and when you did see it those people never came back to help the community like Colin.

I can only imagine working your whole life to protect people that look like yourself only to turn on the TV to see a man being murdered by someone who was supposed to protect him. The video of George Floyd's murder went on for nearly 10 minutes. I found it hard to watch.

For years Colin was convincing his community to get their education, to go vote, to follow the law, to pay attention to the politics and that video made it feel like all the work he was doing had accomplished nothing, that he and the voice of his community wasn't heard. People lost hope after that. I think Colin did too.

What I know is that what Colin did is not a reflection of who he is and I do not think he was making a statement or anything. I know for a fact that he was not even supposed to be in New York that weekend and was here only because his 10-year college reunion was cancelled for the pandemic. We need Colin to be free for his community but more importantly for the kids who are his responsibility.

Any harsh sentencing will be detrimental to these kids who have been bounced around from home to home. As someone who used to be in those kids' shoes, I know how harmful for them a prison sentence for Colin would be, and how much Colin's loving presence in their lives means to them.

2

Sincerely,

Kenny Jeannot

# Exhibit S-6

# FAMILY DEFENSE CLINIC
# WASHINGTON SQUARE LEGAL SERVICES, INC.

245 Sullivan Street, 5th floor
New York, NY 10012-1301
(212) 998-6693

CHRISTINE GOTTLIEB
*Supervising Attorney*

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
Theodore Roosevelt United States Courthouse
225 Cadman Plaza East, Room 704S
Brooklyn, NY 11201-1818

Dear Judge Cogan:

As a former teacher of Colinford Mattis, I write to share my experience of him and ask you to show him leniency.

Colin was a student in the Family Defense Clinic that I teach at NYU School of Law during the 2015-16 school year. The clinic is an intensive, 14-credit course, in which I closely supervise the students on Family Court cases. As a result, I often have the opportunity to get to know them better than law faculty in larger classes do. Colin made an immediate positive impression on me, which only grew through the year as he consistently demonstrated the qualities that inspire me to teach.

Colin brought a thoughtfulness, a work ethic, and a commitment to social justice that stood out even among the strong students I have been privileged to teach at NYU for the last twenty years. By the time I meet them in their second and third years of law school, many of my students already have the intellectual abilities and discipline, as Colin did, to be well on the way to becoming excellent lawyers. Far less common is for law students to have developed yet the self-possession, groundedness, and generosity that allow them to be as truly client-centered as they aspire to be. Colin had those from the day I met him.

We do a client interview simulation at the beginning of each school year. Almost always, the simulation reveals that law students are more self-centered than they mean to be: they frequently highlight their own knowledge by speaking in jargon that is inaccessible to clients; they ignore the emotional realities the clients face; and they unintentionally treat the clients as a means to their professional ends rather than as true equals. In contrast, Colin brought a warmth, an empathy, and a respect for others to this interaction that I would want a family member of mine to receive if they ever needed a Family Court lawyer – even as he accomplished all the lawyerly tasks that were required of the situation.

Too often, even well-meaning students (and professionals) approach the families enmeshed in the Family Court system with judgment and an unspoken assumption of superiority. Colin never did. His warmth and humility were apparent in every interaction I saw him have with

his fellow law students, social workers, opposing counsel and – most importantly – his clients. He was never looking to compete with or one-up his colleagues; never looking to beat opposing counsel for the sake of a victory; never looking to feel good by looking down on someone who had made mistakes or even to feel self-satisfied because he was a "do gooder." He seemed, always, to be motivated by genuine care for others and commitment to justice and equality.

I remember, in particular, Colin's work with a young mother who was homeless and struggling with drug addiction. Colin was there for her tirelessly: helping her find multiple drug programs, get Medicaid coverage to pay for those programs, and supporting her throughout myriad ups and downs. This client's path was rocky and Colin repeatedly went above and beyond the obligations of a legal advocate to be there for her. He wrote a beautiful motion explaining to the Court how this mother had recognized and taken responsibility for her mistakes and why she should be given the chance to be reunified with her children. He never downplayed the mistakes the client had made. Rather, he persuasively argued that family reunification would serve not only this single mother, but also the children who dearly loved her. As I write this, it is impossible for me not to think of the children who today love and need Colin.

It is not an exaggeration to say that Colin demonstrated a warmth and selflessness that I deeply admired and hope all my students aspire to. It is also all-too-clear that he made a grave mistake. I respectfully ask that you offer Colin the generosity of spirit that I consistently saw him show to all those around him.

I appreciate your taking the time to read my letter.

Sincerely,

*Christine Gottlieb*

Christine Gottlieb

**Exhibit S-7**



**New York University**
*A private university in the public service*

School of Law
Faculty of Law

Clinical Law Center
245 Sullivan Street
New York, NY 10012-1301
Telephone:   (212) 998-6460
Telecopier:   (212) 995-4031
email: martin.guggenheim@nyu.edu

Professor Martin Guggenheim
Fiorello LaGuardia Professor of Clinical Law Emeritus

December 1, 2022

The Honorable Brian M. Cogan
United States District Court Eastern District of New York
Theodore Roosevelt United States Courthouse
225 Cadman Plaza East, Room 704S
Brooklyn, NY 11201-1818

Re: United States v. Colinford Mattis
20 CR. 203-1 (BMC)

Dear Judge Cogan:

I am writing to provide you with some appreciation of Colinford Mattis, a law student I worked closely with when he attended NYU in the hope that you will conclude that Colin is considerably better than his behavior on the night of his arrest and that he has considerable things to give to the community if given a chance to make up for that night.

Colin was a student in my year-long Family Defense Clinic in his third year at law school. This is an intensive, 14-credit, year-long course in which students represent parents enmeshed in the child welfare system in Family Court. Colin stood out in the class in a number of ways. First, he was the only student with lived experience in the child welfare system. His family helped raise foster children during Colin's childhood and Colin grew up in a community in which the child welfare system was well-known. This was the only clinic to which Colin applied because, as he explained to me in his initial interview, he wanted to give back to the community by working with parents to prevent the removal of children from their custody or to help them safely regain their custody in the shortest possible time.

Colin proved to be a passionate advocate for his clients; someone who worked very hard on his cases and who made clear to his clients and the rest of the class how much achieving their objectives mattered to him. He was not the best lawyer in the class. But he brought a commitment to his clients, and a sensitivity to the needs of the community impacted by the child welfare system, that made him outstanding. He literally stood out in our twice-weekly seminars because he was the only student who grew up in the community that our clients came from. As such, Colin often had more to say to the other students, and the instructors, than anyone else in the course.

Colinford Mattis Letter
December 1, 2022
Page 2

It was my pleasure to have been Colin's teacher. I admire him and am certain he has much to give to the cause of social justice. What he brought to the classroom, above all else, was a grounded commitment to care for children who, because of life's uncertainties, have need for an adult to love and nurture them. Colin spoke with passion about the home he grew up in while his mother fostered children. When Colin himself lost his mother to an early death, he continued to raise foster children. Of all the sad aspects of this case, and what Colin did that led to his arrest, the most painful for him I am sure is the impact his choice may have on the children dependent on him now. And, as a scholar in the family law field, it is also important to recognize that imprisoning Colin will result in certain, lasting harm on the children that Colin is raising.

I fervently hope the Court will be mindful of the goodness Colin does every day and the young people who rely on him for their well-being when deciding the sentence to impose in this case. He's a special person who, in my opinion, deserves special consideration.

Respectfully yours,

*Martin Guggenheim*

Martin Guggenheim

# Exhibit S-8



**NEW YORK UNIVERSITY**
*A private university in the public service*

**School of Law**

40 Washington Square South, Rm- 426
New York, New York 10012-1099
Telephone: (212) 998-6265
Facsimile: (212) 995-4590
Email: sylvialaw42@gmail.com

**Sylvia A. Law**
*Elizabeth K. Dollard Professor of Law, Medicine and Psychiatry, Emerita*

December 7, 2022

Hon. Brian M. Cogan
United States District Court
For the Eastern District of New York
Brooklyn, New York 11232

Re: Colinford Mattis

Dear Judge Cogan:

I join my NYU Law School colleagues in urging you to make Colin Mattis's punishment proportional to his crime.   His personal history does not excuse the crime, to which he has pleaded guilty and for which he has already experienced serious consequences. But it does help to explain why his action was a sharp departure from a life of responsibility and caring.

In 2016 Colin was a member of the Cuba Legal Studies Group at NYU Law School.  For many years, I have offered students interested in Cuba the opportunity to organize a program that meets U.S. rules for legal travel to Cuba, NYU requirements for academic credit, and my standards of excellence. The students lead 14 weeks of seminars, raise the money for travel, negotiate with the Cubans about the details of our visit, and write substantial papers on some aspect of Cuban law and policy.  I provide guidance, access to my library of Cuba studies and experts, and join them on the trip.  The student groups are always diverse, including students sympathetic to and critical of Cuba.  Over the years, students have been interested in gender equality, health care, education, LGBT rights, including HIV-AIDs policies, and opportunities for US investment, were relations between Cuba and the US to change.

In 2016, Colin was a respected and beloved member of an unusually strong group. He cared for us all in moments of travel challenges and personal crisis. The 2016 Cuba trip focused more on race than we had on any earlier visits.  In retrospect, I think this was Colin's influence.  He wrote one of the best student papers I know, on race relations in Cuba.  Over 60% of the population is Afro-Cuban. Since 1959, the Castro regime has rejected racism, but the leadership is still white, and people of color are poor. Colin connected with young people of color to explore these issues.

Colin also displayed his attentiveness to race relations in Cuba during our discussions with lawyers and judges there. For those discussions, leaders of the bench and bar put forward speakers who were virtually all white, even though most of the litigants were Afro-Cuban. I had been in these discussions for many years and never thought to challenge that dynamic. Colin and one of his colleagues did so, in respectful ways. This experience accurately reflects Colin's true nature -- someone who is principled and seeks social change in respectful and productive ways -- far more than has aberrant actions on May 30, 2020.

That is why I was shocked by Colin's actions on that night in May 2020. It was inconsistent with everything I know and admire about him. The Colin I know is not a revolutionary but a bridge builder. Millions were shocked to action by the brutal killing of George Floyd. Colin's reaction was certainly more extreme, perhaps in part because of his personal experience as a Black man and his deep understanding of the pervasiveness of racism. This does not in any way excuse his conduct, but it does help to explain it.

He has acknowledged that his action was wrong and deserving of punishment. But he has already been seriously punished. He has lost his law license, something I know mattered deeply to him and to his family. He has been incarcerated. He has spent more than two years on house arrest, and will have a felony conviction. These serious consequences are commensurate with the seriousness of Colin's crime, especially given the aberrational nature of his actions, and will make it clear to the public -- as has already been made clear to Colin -- that his conduct should never be repeated.

Finally, I know that Colin's family loves and needs him dearly. I firmly believe that a sentence that would allow Colin to remain with his family, and continue the positive contributions that have defined all but a few hours of his life, would be proportional here.

Sincerely,

/s/ Sylvia A. Law

Sylvia A. Law

**Exhibit S-9**



**Christopher Jon Sprigman**
*Murray and Kathleen Bring Professor of Law and Co-Director, Engelberg Center for Innovation Law and Policy*

40 Washington Square South, 314C
New York, NY 10012-1099
T: (212) 992-8162 | F: (212) 995-4341
christopher.sprigman@nyu.edu

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
Theodore Roosevelt United States Courthouse
225 Cadman Plaza East, Room 704S
Brooklyn, NY 11201-1818

December 10, 2022

Dear Judge Cogan:

I am writing in regard to Colin Mattis, who was my student at NYU Law in both the introductory copyright law course and in the upper-level innovation law colloquium. This is the first such letter I have ever had to write on behalf of a law student, and I would never have suspected that I'd be writing this letter for Colin. Colin was a very good and hard-working law student and I remember him well as a willing and constructive participant in class discussions. Colin is a good person who was well-liked by his fellow students and by other members of the faculty. I never heard a single word that would indicate that Colin had any sort of trouble in law school whatsoever. Colin was, in short, exactly the kind of law student that I came to NYU to teach.

Please understand that I do not wish to minimize or excuse what Colin did. I understand that Colin has accepted responsibility for his crime and has apologized. I would not be writing this letter if he hadn't.

I ask that the Court use its discretion to sentence Colin to time served, along with a one-year period of home confinement and appropriate restitution and community service. That punishment is, I believe, proportionate to his offense in light of Colin's previously clean record, the support he provides for his family and for the three children he is fostering, and, importantly, the very particular and unusual circumstances that provide context for Colin's offense.

In light of these factors, I do not believe that imprisonment beyond the time Colin has already served is in the interests of justice. Specifically, I do not believe that a sentence imposing additional imprisonment is needed either to incapacitate Colin or to deter him from committing future crimes. And I fear that a sentence imposing additional prison time would be a grave threat to the foster children who depend on Colin, and to whom Colin has provided a stable and functional home.

I understand that even if the Court does as I and many others have requested and imposes no additional prison time, Colin will have a lot of work to do to rebuild his life. The collateral consequences of Colin's felony conviction, including his disbarment, mean that Colin may never be able to take full advantage of the legal education I and my colleagues worked to provide to him. In

1

view of the pro bono legal services that Colin has provided to clients, that is a serious loss both to Colin and to the community.

I hope the Court will agree, in light of Colin's clean record and the circumstances both of Colin's life and the events surrounding Colin's offense, that a sentence of time served plus a year of home detention and appropriate restitution and community service is an appropriate punishment that will avoid additional harm to Colin and to his foster children.

Thank you for your time and attention.  Please do not hesitate to call if I can provide any further information or assistance.

Best regards,

Christopher Jon Sprigman

**Exhibit S-10**



## THE NEW YORK CENTER FOR NEUROPSYCHOLOGY
## & FORENSIC BEHAVIORAL SCIENCE

N.G. BERRILL, PH.D.
EXECUTIVE DIRECTOR

Hon. Brian M. Cogan
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11232

November 29, 2022

Re:     Letter for Colinford Mattis

Honorable Judge:

I have known Mr. Mattis as his therapist through NY Forensic Practice for the past 3 months, and I am writing to inform you of his progress in therapy.

Mr. Mattis was assigned to my caseload in September 2022 and began treatment once weekly in person. He adhered to all scheduled sessions, was on time, and made good use of therapy.  He was forthcoming regarding his criminal offense and the negative impact it's had on his community, those close to him, and his professional and personal life. It was noteworthy to me that he focused on community harm instead of the harm that was coming his way.

Specifically, Mr. Mattis has explored how his poor decision making on one night led to a criminal offense that is going to change the entire trajectory of his life. He has been introspective and we are still getting to the root of what caused him to act the way he did that night.

Mr. Mattis was an attorney and as I understand it a very well educated one; he did not tell me this himself – I learned it from reading about his case. I know that he is caring for his three young foster children, one of whom has exceptional needs. He has explored how his offense has jeopardized his role as a provider. Mr. Mattis is rightly disturbed by the harm coming their way – these children have been in foster care before and had finally settled into a home. It is his irresponsible conduct that may disrupt this family unit. Colin is well aware that he has no one to blame but himself.

He has been focused on the rupture with his cousin, a law enforcement officer who told Colin that he should have thought of her – she could be one of the officers – and that she was surprised he did not see that he has a cousin in law enforcement and a sister who was a corrections officer. Colin and his cousin are talking about this and that is a good sign for a therapist – the more people discuss, the greater the likelihood of positive forward movement.

The other issues he has brought up is that he has lost his law license and can't practice law. In session, he said that he was surprised by how upsetting that was to him – he had not expected to feel such anxiety and pain at hearing that news. He did not know the day that he was disbarred and when his attorney told him, he was in shock even though he was expecting the news to come his way.

During the period leading to sentencing, Mr. Mattis has been confined to his home except to work and attend therapy sessions. To his credit, he has utilized this time to remediate the behaviors leading to his offense, particularly consumption of ETOH.  Mr. Mattis has been sober in excess of 500 days. He recognizes the need to respect law enforcement and how his actions were harmful.  Additionally, Mr. Mattis has become more involved in the East New York community and his church. He is working in sales and is finding different ways to support himself and the three kids.

Mr. Mattis also talks about the toll taking care of three young children and I hear the concern he has about one who has ███████████████████. He talks about his nephew and the hard time he has with his mother (Colin's sister). The nephew is very dependent on Colin and that is another issue as the boy is 15 years old and clashes with his mother. Colin has discussed the delicate balance of helping his nephew without usurping his mother's role.

He is very involved with his church and sought their guidance on how to repair and reconcile for his offense.

We do not often write these letters to the court but I think in this case a long sentence would deprive Mr. Mattis' children of the stability that they very much need.  The three, who are not all biologically related, have made themselves one family and I would be concerned by a disruption of that unit.

I therefore offer this letter without reservation and hope for leniency for Mr. Mattis.

Sincerely,

Diane Racz, LCSW

**Exhibit S-11**

# AUDIO FILE PROVIDED IN .M4A NATIVE FORMAT

**Exhibit S-11 provided in native format via e-mail**

# Exhibit S-12

# AUDIO FILE PROVIDED IN .M4A NATIVE FORMAT

**Exhibit S-12 provided in native format via e-mail**

**Exhibit S-13**

# AUDIO FILE PROVIDED IN .M4A NATIVE FORMAT

**Exhibit S-13 provided in native format via e-mail**

**Exhibit S-14**

# AUDIO FILE PROVIDED IN .M4A NATIVE FORMAT

**Exhibit S-14 provided in native format via e-mail**

# Exhibit S-15

# AUDIO FILE PROVIDED IN .M4A NATIVE FORMAT

**Exhibit S-15 provided in native format via e-mail**

**Exhibit S-16**

# AUDIO FILE PROVIDED IN .M4A NATIVE FORMAT

**Exhibit S-16 provided in native format via e-mail**

**Exhibit S-17**

1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   ------------------------------x
                                       20-CR-203(BMC)
3   UNITED STATES OF AMERICA,
                                       United States Courthouse
4              Plaintiff,             Brooklyn, New York

5              -against-              November 18, 2022
                                      10:00 a.m.
6   UROOJ RAHMAN,

7              Defendant.

8   ------------------------------x

9          TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
             BEFORE THE HONORABLE BRIAN M. COGAN
10               UNITED STATES DISTRICT JUDGE

11  APPEARANCES

12  For the Government:      BREON S. PEACE, ESQ.
                             UNITED STATES ATTORNEY
13                           Eastern District of New York
                             271 Cadman Plaza East
14                           Brooklyn, New York 11201
                             BY:  IAN CRAIG RICHARDSON, ESQ.
15                               JONATHAN EDGAR ALGOR, IV, ESQ.
                             Assistant United States Attorneys
16
    For the Defendant:       DRINKER, BIDDLE & REATH, LLP
17                           600 Campus Drive
                             Florham Park, New Jersey 07932-1047
18                           BY:  PETER W. BALDWIN, ESQ.
                                 RITA K. MAXWELL, ESQ.
19

20  Also Present:            UROOJ RAHMAN, DEFENDANT
                             SHAYNA BRYANT, PRETRIAL
21

22  Court Reporter:          AVERY N. ARMSTRONG, RPR
                             Phone:  718-613-2419
23                           Fax:    718-613-2639
                             Email:  Aarm.edny@gmail.com

24

25  Proceedings recorded by mechanical stenography.  Transcript
    produced by computer-aided transcription.

PROCEEDING                                    2

1            (In open court.)

2            THE COURTROOM DEPUTY:  All rise.  Honorable Brian M.

3   Cogan now presiding.

4            (Judge BRIAN M. COGAN enters the courtroom.)

5            THE COURT:  Good morning.  Have a seat, please.

6            THE COURTROOM DEPUTY:  Case number 20-CR-203, United

7   States of America versus Rahman.

8            Will the attorneys please state their names for the

9   record beginning with the Government.

10           MR. RICHARDSON:  Good morning, Your Honor.

11           Ian Richardson and Jonathan Algor for the United

12   States, and we're joined by Shayna Bryant from the U.S.

13   Probation Department.

14           THE COURT:  Good morning.

15           MR. BALDWIN:  Good morning, Your Honor.

16           Peter Baldwin and Rita Maxwell on behalf of the

17   defendant, Ms. Rahman, who is seated to my right.

18           THE COURT:  All right.  Good morning.  Good morning,

19   Ms. Rahman.

20           MS. RAHMAN:  Good morning.

21           THE COURT:  Okay.  We are on for sentencing.  What I

22   want to do firsts is go through the documents that I have

23   reviewed in preparing for the sentencing.  I want to say make

24   sure, Ms. Rahman, that you have reviewed all of these

25   documents, so listen carefully.

PROCEEDING                                    3

1          I'm starting with the readvised PSR which is pretty

2     much the same as the first one, except for the change in plea.

3     That's from February 2nd of this year.  I then have the

4     defendant's sentencing memorandum with Exhibits A through E.

5     That's from September 9th of this year.  There is a second

6     addendum to the readvised PSR which I think probably should

7     have been called the first addendum to the readvised.  It's

8     the second if you take into account the first PSR.  That's

9     from September 12th.  I have the Government's sentencing

10    memorandum from September 22nd.  I have a reply from the

11    defendant, reply sentencing memorandum on November 11th.

12    Those are the main documents.  There are a couple of other

13    things.

14          First of all, I've received from the Government, a

15    proposed restitution order.  I don't do that usually.

16          Do I have to do that here?  Usually I just pronounce

17    the restitution obligations as part of the sentence, it's put

18    into the judgment, and it doesn't take a separate order.  It's

19    not like a forfeiture order.

20          MR. RICHARDSON:  Your Honor, I think it has

21    traditionally been our office's practice to prepare a

22    separation restitution order --

23          THE COURT:  Not in front of me.  I can tell you

24    that.

25          MR. RICHARDSON:  Understood, Your Honor.

PROCEEDING                    4

1      It does have the information about who the funds are

2  to be paid for and the address.

3      THE COURT:  You know, I always pronounce that and I

4  put that into the judgment, but okay.  You want me to sign,

5  there's no problem signing it.

6      Also, I handed out to the parties before we met

7  here, a copy of probation's recommendation as to sentencing

8  and I gave them an opportunity to read that.  It is a

9  confidential document because it has some personal information

10 about the defendant in it, so I'm not going to publish that.

11 But I will note for the record that the probation department

12 is recommending a sentence of 48 months custody and two years

13 supervised release.

14      In addition, prior to coming here today, I posted on

15 the docket, a copy of the term terms, the proposed terms of

16 supervised release, and I asked the defendants to just read

17 those and be familiar with them, so if necessary, we can talk

18 about them today because they're a little bit wordy and

19 lengthy.

20      All right.  That's really all I have reviewed.

21      Am I missing anything?

22      MR. RICHARDSON:  I don't believe so, Your Honor.

23      MR. BALDWIN:  Not from the defense, Your Honor.

24      THE COURT:  Ms. Rahman, have you had a chance to

25 review all of those documents?

```
                         PROCEEDING                    5
```

1           MS. RAHMAN:  Yes, Your Honor.

2           THE COURT:  Okay.  Now, with regard to my findings

3    of fact that will control the sentencing, there's a couple of

4    things I think defense counsel kind of objected to.  I don't

5    know that you're really objecting to what happened, you're

6    just arguing what inferences should be drawn from what

7    happened; is that right?

8           MR. BALDWIN:  That's correct, Your Honor.  The only

9    real objection, if you want to call it that, is more a

10   technical objection.  We're certainly not arguing about the

11   facts.

12          THE COURT:  Okay.  So there's no particular

13   paragraph of the PSR's description of the offense that you

14   want to take issue with?

15          MR. BALDWIN:  No, Your Honor.

16          THE COURT:  Okay.  In that case -- I assume that's

17   true with the Government too?

18          MR. RICHARDSON:  Yes, Your Honor.

19          THE COURT:  In that case, I will adopt those

20   portions A and C of the PSR as described, the offense and the

21   offender characteristics, as my findings of fact for purposes

22   of this sentencing.

23          Okay.  Next, let's turn to the guidelines.  I will

24   note that the guidelines are only one factor for me to

25   consider.  They are wholly advisory, and I'm not in any way

PROCEEDING                           6

1    bound by them.

2         I know the parties in their plea agreement

3    stipulated to an offense level of 33, a Criminal History

4    Category of VI because of terrorism enhancement, and that

5    would give us a range of something like -- I think it was like

6    235 to 293 months.  But that's ratcheted down, of course,

7    because the maximum sentence I can impose is five years.

8         Am I right about the guideline calculation?

9         MR. RICHARDSON:  Yes, Your Honor.

10        MR. BALDWIN:  Yes, Your Honor.

11        THE COURT:  Now, I understand that you raised a

12   couple of things about how -- you were very careful not to

13   dispute the stipulated guidelines range and that's fine.

14        But I'm, again, interpreting your -- I won't call

15   them objections -- your qualifications as something I should

16   consider in weighting the guidelines rather than to their

17   calculation.

18        MR. BALDWIN:  That's exactly correct, Your Honor.

19        THE COURT:  Okay.  So that is my finding on the

20   guidelines.  All right.

21        Let me then hear from the parties as to all the

22   3553(a) factors.  I'll start with the defense.

23        I do want to say, don't worry about the guidelines.

24   I am not viewing this as a 60-month potential sentence.  That

25   is the maximum I could impose, but the guidelines are not

PROCEEDING                                    7

1    having any affect on my decision, whatever I decide to do

2    here, both because they're so Draconian, but also because

3    they're just really overweighed, I think, by much more

4    important considerations in the case.  So don't feel a need to

5    tell me why the guidelines are wrong.

6              MR. BALDWIN:  Thank you, Your Honor.  If it's all

7    right with the Court, I'll stand to address my remarks.

8              THE COURT:  Whichever you prefer.

9              MR. BALDWIN:  And I appreciate the Court's

10   admonition about the guidelines.

11             I'd like to begin today by acknowledging the

12   tremendous support for Urooj here in the courtroom and also in

13   the overflow courtroom.  I would start with Urooj's family.

14   Her mother is here, Arjumand, her sister, Shagufta, and her

15   brother, Naseem, and there are many others, some of whom have

16   traveled great distances to be here today, including many of

17   Urooj's long-time friends, her colleagues, and even some of

18   her law school professors.  The support from family, friends,

19   colleagues, and her community, I think really speaks volumes

20   about Urooj's true character.

21             I also wanted to acknowledge at the outset what a

22   deeply personal experience this sentencing is for me.  I've

23   come to know Urooj very well over the course of the last two

24   and a half years, and we've spent countless hours talking

25   about this case and preparing for this moment.  I've seen her

PROCEEDING                              8

1    at her lowest point and I've watched with pride her personal

2    growth since the time of her arrest.  I know she regrets her

3    actions totally and completely.  I also know that if given the

4    chance to prove herself and prove that she is deserving of

5    leniency, she will do just that.

6          So we're obviously here today so that the Court may

7    determine an appropriate and just punishment for Urooj's

8    actions on the night of May 29, 2020.

9          Undoubtedly, this is a difficult decision.  There's

10   no dispute that the offense conduct here was incredibly

11   serious.  It was a dangerous and reprehensible lapse of

12   judgment.  None of the things I say today are intended to

13   minimize the severity of Urooj's actions.  Her conduct was

14   wrong, and she acknowledges that.  But we truly believe that

15   the totality of Section 3553(a) factors justifies the

16   imposition of a time-served sentence.  We do recognize that

17   there must be a punishment for Urooj's actions, but we hope

18   that the Court will consider the broader context, that is more

19   than what occurred during a few charged hours on the night of

20   May 29, 2020, when determining what is that appropriate

21   sentence for Urooj in this case.

22          Now, when we're talking about understanding and

23   appreciating that broader context about Urooj, I think the

24   best place to start is by talking about her history and

25   characteristics.  As we wrote about in detail in our

PROCEEDING                                  9

1    sentencing memorandum, in spite of the fact that Urooj has

2    experienced a great deal of personal trauma in her life, she's

3    consistently thrived and excelled, both personally and

4    professionally.  She was an accomplished student.  She

5    graduated with distinction from Fordham with undergraduate and

6    law degrees, and while she was in law school, she was selected

7    for multiple fellowships including Fordham's prestigious Tolan

8    Fellowship for International Human Rights, and as a law

9    student, she also worked as an advocate for disadvantaged

10   people including refugees and LGBTQ Plus individuals.

11          After law school, she's put her legal training to

12   productive use as an advocate for underrepresented people both

13   here in New York and around the world.  Most recently, Urooj

14   worked as a staff attorney in the housing court division of

15   the Bronx Legal Services where she tirelessly represented

16   indigent clients who had been evicted from their homes.  Prior

17   to that, Urooj worked on behalf of refugees in countries like

18   Greece and Egypt and Turkey, and before that, she worked as

19   the policy director for Bob Gangi's mayoral campaign for New

20   York City.  Numerous colleagues from all of these jobs have

21   submitted letters to the Court extolling Urooj's hard work,

22   dedication, excellent advocacy, and commitment to justice

23   which, again, speaks volumes about Urooj's true character.

24          Finally, even with her extensive professional

25   commitments and accomplishments, Urooj has always made her

PROCEEDING                          10

1    family a priority.  To this end, since her father's untimely

2    death 10 years ago, Urooj has been and continues to be her

3    mother's primary caretaker.

4            So I suppose the real question for today is what

5    would drive this otherwise successful, law-abiding, and

6    peaceful person to act the way she did on May 29, 2020.  Now,

7    Urooj, like so many other people in this country, was deeply

8    affected by George Floyd's murder.  She wanted to be apart of

9    a movement involving her fellow New Yorkers who were seeking

10   justice in the face of a horrible injustice.  There was some

11   hopefulness to this collective movement, but for Urooj and

12   many others who participated in the protests, there was also a

13   palpable accepts of anger and despair, and for Urooj, this

14   sense of anger and despair was heightened by the chaos and the

15   violence that she witnessed during the protest, and as

16   Dr. Lebowitz explains in her report that we submitted in

17   connection with our sentencing memorandum, Urooj's emotions

18   that evening also were influenced by her own past personal

19   trauma, including physical, sexual, and emotional abuse that

20   she had suffered at the hands of a series of men during the

21   course of her life, including the days and weeks leading up to

22   May 29, 2020, as well as emotionally trauma stemming from her

23   now deceased older brother's mental illness, and her work with

24   other people who themselves have been victimized, brutely

25   victimized by injustice and violence.

PROCEEDING                                    11

1        What's abundantly clear is that Urooj's emotions,

2   her anger, her despair, her rage, they unfortunately got the

3   better of her that evening for a few hours that evening.  They

4   caused her to act in a way that was contrary to everything

5   that she stood for, and that in retrospect is deeply troubling

6   and embarrassing for her.  Urooj's actions that night weren't

7   part of some well-thought-out plan, they were a visceral

8   reaction to what she was seeing, and they were influenced by

9   her own past experiences.  Indeed, nearly all of Urooj's

10  communications that have been submitted for the Court's

11  consideration, the text messages, the video tape statements,

12  the social media posts, they occurred in a span of just a few

13  hours while Urooj was at the protest.  These statements which

14  Urooj regrets and knows were wrong and unhelpful show the

15  depths to which she had sunk that evening.  They show someone

16  that Urooj and her friends and her family don't recognize,

17  someone overcome with emotion, someone caught up in a charged

18  and frenetic moment in time.

19       What Urooj saw that night, the violence, the chaos,

20  and the charged at atmosphere, combined with what was going on

21  in her own life and her own past personal trauma came together

22  in a perfect storm that Urooj was, at that time, unfortunately

23  unprepared to process in a productive and rational way, and as

24  a result, she acted impulsively, unexpectedly, and in an

25  utterly regrettable and a aberrant fashion.

PROCEEDING                              12

1      THE COURT:  Let me ask you one question about

2  something that bothers me in the file.

3      If you look at the arrest picture that was taken

4  when she's, you know, wearing her, the struggle continues

5  shirt with the clenched fist, and she's got kind of a smirk on

6  her face, she doesn't seem angry to me.  She seems, like,

7  happy to me.

8      MR. BALDWIN:  I think that that's not correct, Your

9  Honor.  I think more than anything, it's bewilderment.  I

10  think, you know, she had -- perhaps she shouldn't have been

11  surprised about by where she found herself at that moment in

12  time, but I think at that point, it's utter bewilderment,

13  utter disbelief that she had, sort of, put herself in that

14  position to where she was there getting her picture taken

15  after her arrest.  I don't think in any way it was a sense of

16  happiness or pride.  I think immediately after the action

17  itself, Your Honor, there was a sense of regret and certainly

18  I think at the time of arrest, there was a sense of, you know,

19  what have I done to myself, why I have made this decision, why

20  have I put myself here.  More of a sense of bewilderment than

21  anything else.

22      THE COURT:  I just -- I don't know that I can get

23  that from the picture that I'm referring to.  You know,

24  charitably, I could call it a Mona Lisa smile.  I suppose it

25  can be shock or bewilderment.  That's possible.  But, you

PROCEEDING                                    13

1   know, it almost seems like she's displaying proudly that

2   t-shirt.

3              MR. BALDWIN:  I think, Your Honor -- you know, the

4   t-shirt says what it says.  Obviously, we can't dispute what's

5   on the t-shirt.  What I can tell you is that, you know, just

6   from my own conversations with her, from my understanding of

7   what Dr. Lebowitz concluded, that there was an immediate sense

8   of regret.  There was an immediate sense of knowledge that

9   what she had done was not a productive and not a good way to

10  deal with the feelings that she was feeling that night, and so

11  the best I can describe it is a sense of shock, confusion, and

12  disbelief that she had found herself in that position.

13             THE COURT:  No, I'm not excluding that possibility,

14  and I don't want to put too much weight on the appearance of

15  that one picture when I've got a record that's as thick as my

16  arm span.  I just wanted you to respond to that.

17             MR. BALDWIN:  And one thing I would note here -- and

18  I don't want to put too much weight on this, Your Honor -- but

19  it's noted in the presentence report, we've noted it in our

20  sentencing submission, we're not rasing this as a legal

21  defense in any way, but there was some consumption of alcohol

22  that evening, as well.

23             THE COURT:  I thought that was also consistent with

24  the picture.  Yeah, that's possible.

25             MR. BALDWIN:  And perhaps that is one of the factors

1   that weighs in here, as well.  And again, we're note rasing

2   that as an excuse or some kind of justification, but it's

3   there.  And so it's something that I think probably weighed

4   into that situation.  It contributed, maybe, to the sense of

5   bewilderment that I'm talking about.

6           All right.  So Urooj's journey in the last two and a

7   half years since that fateful night has been not only to try

8   to understand why she acted the way she did, but also and

9   perhaps more importantly, to try to take steps to improve

10  herself to ensure that nothing like this ever happens again.

11  So what has she done since the time of her arrest?  Well,

12  crucially, she's now regularly seeing a psychiatrist, and two

13  therapists.  And this has helped her get on the right

14  medication to address real mental health issues.  It's also

15  helped her understanding her own emotional well-being better

16  and helped her learn coping mechanisms that can ensure that

17  she doesn't make another mistake like this in the future, even

18  in a situation as potentially as charged as the one she faced

19  on May 29th.  She's attending and participating in a

20  Alcoholics Anonymous, and this is to address and remediate a

21  unhealthy relationship with alcohol that until the time of her

22  arrest in this case had gone undiagnosed and untreated.  She's

23  rediscovered her spirituality and rededicated herself to her

24  faith which has provided guidance and meaning for her life.

25  She's engaged positively with her support network, many of

PROCEEDING                          15

1   whom are in the court today.  I think it's fair to say that

2   not many defendants who come into this courthouse and into

3   this courtroom have such an impressive support system.  Urooj

4   understands how lucky she is and she understands that these

5   people are available to help her.

6           She's also found great purpose in caring for her

7   79-year-old mother.  As I noted before, since her father's

8   death, Urooj has been her mother's principal caretaker.  But

9   over the course of the past two years as her mother's health

10  has in some ways deteriorated, Urooj has been singularly

11  responsible for ensuring that her mother's health care needs

12  are adequately met.  And this has brought them even closer

13  together than they were before.

14          Finally, Urooj has continued to be employed during

15  her extended period of supervised release -- excuse me,

16  extended period of pretrial release.  Urooj voluntarily agreed

17  to surrender her law license in the wake of the charges in

18  this case, and she can no longer practice law which has been

19  personally devastating for her, because her work had filled

20  her with such pride and purpose.  Nevertheless, she's

21  continued to find work to help other people, and in

22  particular, other people involved in the criminal justice

23  system.  While she's been on pretrial release in case, Urooj

24  has worked as a grant and policy coordinator, a Witness for

25  Mass Characterization, and as the associate director and

1    policy coordinator at the Police Reform Organizing Project.

2              Going forward, Urooj will continue to maintain, as

3    she always has, steady employment, and she'll continue to work

4    to seek justice for others in a positive and lawful way.   In

5    other words, she'll continue to do what she did every day up

6    to May 29th, 2020, and what she's done every day since that

7    day.  She will be a productive and law-abiding member of

8    society.

9              Now, obviously there must be a punishment for

10   Urooj's actions.  But that punishment, as this Court knows,

11   but not be greater than necessary to accomplish the purposes

12   laid out in Section 3553(a).  And here, while we fully

13   acknowledge the seriousness of Urooj's offense, we

14   respectfully submit that on balance, the Section 3553(a)

15   factors would support the imposition of a time-served

16   sentence.  We've already discussed Urooj's history and

17   characteristics in detail, but I think it's fair to say that

18   aside from a few hours on the night of May 29, 2020, she has

19   led a wholly law-abiding and admirable life.

20             THE COURT:  Didn't it start earlier than that?  I

21   mean, we have the event.  We have the bombing of the police

22   car in that evening, in that few hour passage.  But I thought

23   I saw something in the record where she had started

24   communicating about, we need to take down the police, really

25   that morning?

1          MR. BALDWIN:  There were text messages outside or

2    communications outside of that few hour time period.  That's

3    correct, Your Honor.  And the presentence report quotes some

4    of those text messages, and there were some from the early

5    morning hours of that May 29th.  But I would submit that

6    really what those are talking about is, I want to participate

7    in the protest.  I don't think what you see there is, hey, I

8    want to get stuff together to build a Molotov cocktail to

9    throw in a car.  There was -- certainly there was a

10   recognition that the protests were going on, that this

11   movement was happening, and that she wanted to be

12   participating in it, but I think really what you see is really

13   sort of the charged and more regrettable statements are made

14   in those, sort of, six hours or so prior to the incident in

15   question.

16          And now with respect to deterrence, hopefully it's

17   clear and I hope it will be clear after Urooj speaks to Your

18   Honor that she understands she made a terrible mistake.  And

19   given that this mistake was so utterly aberrant in nature,

20   there's virtually no risk that she will reoffend.  Further, if

21   the Court sees fit to impose a time-served sentence, such a

22   sentence will be very serious and will serve as a more than

23   adequate deterrent.  It would involve, among other things, a

24   felony conviction which would follow Urooj for the rest of her

25   life, it would involve the loss of her law license and her

1   profession, which in so many ways, has been fundamental to

2   Urooj's sense of self-worth, it would involve a repayment of

3   over $30,000 in restitution to the NYPD which Urooj agreed to

4   without dispute and which she is prepared to pay immediately,

5   it would involve a period of supervised release with,

6   presumably, very strict restrictions on Urooj's liberty,

7   including if the Court deems it is necessary, an additional

8   term of home confinement.  Now, of course, Urooj has been

9   subject to home confinement since June 2020, and the Court can

10  feel confident that Urooj would comply with any terms of

11  supervised release because she has shown over the course of

12  the last two and a half years that she can do that and she

13  would continue to do that if she was given a time-served

14  sentence.

15          THE COURT:  You know, even though I haven't heard

16  from her yet, I tend to agree with you as to specific

17  deterrence.  I think she understands and will not do anything

18  like this again.  But, you know, what about general

19  deterrence?

20          MR. BALDWIN:  I understand the Court's point, Your

21  Honor.  And I understand, you know, a desire to ensure that

22  the public understands that the Court takes these actions very

23  seriously.  But the way I look at it, Your Honor, is looking

24  at the effect of the sentence on the individual defendant's

25  life, and as I just noted, even if the Court was going to

1    impose a time-served sentence here, the effect of the sentence

2    on Urooj's life is dramatic.  It is life-altering, it is

3    life-changing.  You know, this is something that will follow

4    her for the rest of her life.  It's something that will, in

5    all likelihood, alter the course of the rest of her life.

6    It's something that she has already served some amount of, you

7    know, time for.  It's something that she has spent two and a

8    half years on home confinement for.  It's something that she

9    will continue to have to live with for as long as there are

10   supervised release in this case.  So I don't think it can be

11   said that there must be a lengthy or material imposition of a

12   custodial sentence for there to be general deterrence on the

13   public.  In my mind, it is can the public appreciate that the

14   sentence that the Court imposes is something that is

15   significant on the life and the life lived of that particular

16   defendant.  And I think what's clear in this case is whatever

17   the Court does, that is going to have a material effect on how

18   Urooj lives her life going forward.  It already has.  The

19   effect of this case and of this prosecution and of her guilty

20   plea will follow her for the rest of her life and will be

21   significant.  And so I would just take issue with the

22   conclusion that there must be an imposition of any further

23   custodial sentence in order for the public to understand that

24   the this Court takes her actions seriously.

25           So given everything I've said, Your Honor, we'd

PROCEEDING                              20

1   respectfully submit that an additional custodial sentence is

2   neither necessary nor warranted here.  Sending Urooj back to

3   jail would not serve the interest of justice, but it would

4   immeasurably alter her life and severely hinder her ability to

5   continue to improve herself and to be a productive

6   rehabilitated member of society.  Urooj knows and appreciates

7   the seriousness of her actions, and she doesn't seek to excuse

8   them, as you'll hear.  Not a day has gone by where Urooj has

9   not regretted what she did and thought about what she can do

10  to atone for her mistake.  Urooj stands before this Court

11  today a different and a better person than the one who made a

12  stupid, impulsive, and grievous error on the night of May

13  29th, 2020, during a very emotional period for her and for

14  many other Americans.  She understands the decisions she made

15  that night were not only wrong and dangerous, but also

16  antithetical to her own peaceful worldview.  Today, she's a

17  humbled and improved person, one whose eyes have been opened

18  through hard work and personal introspection, and one who has

19  taken steps to ensure that something like what happened on

20  that night will never ever happen again.

21          We humbly ask this Court not to judge Urooj solely

22  based on her actions during a few-hour period on the night of

23  May 29, 2020, that is not solely based on what is, by her own

24  admission, the worst mistake of her life.  Instead, we ask

25  that you look at Urooj's life as a whole, her personal and

PROCEEDING                                    21

1    professional accomplishments, and her he otherwise unblemished

2    record of self-less work on behalf of others, and we

3    respectfully request that you impose a sentence of

4    time-served.

5               Thank you, Your Honor.

6               THE COURT:  Thank you.  Ms. Rahman, you don't have

7    to say anything, but I'm happy to hear from you if you'd like

8    to.

9               MS. RAHMAN:  May I stand?

10              THE COURT:  Sure.  If you want.

11              MS. RAHMAN:  Good morning, Your Honor.  Thank you

12   for giving me a chance to speak to you today.

13              First, I want to say I'm sorry.  I'm so incredibly

14   sorry for my reckless and wrong actions on the night of

15   May 29th, 2020.  I take complete responsibility for them and I

16   don't think there are enough words to express my sorrow and

17   regret.  What I did was serious and dangerous and I hold

18   myself accountable.  There's no excuse.

19              I'll be spending every day for the rest of my life

20   trying to make it right, but please also know, Your Honor,

21   that I'm not the same person that I was over two years ago,

22   two and a half years ago.  I'll never make a mistake like this

23   ever again.  When I left my home that day on May 29th, I had

24   no intention of doing what I ended up doing by the end of the

25   night.  My sole intention was to lend my voice to my fellow

PROCEEDING                          22

1    New Yorkers in support of justice.  I didn't expect to be so

2    consumed by pain, anger, grief, and despair.  I wish I had

3    been able to fight off those emotions and not let it poison my

4    heart, but I completely lost my way in the emotion of the

5    night.  I can't change the past, Your Honor, as much as I wish

6    I could, but I can make changes in my life going forward to

7    ensure a better future, and that's what I've been doing since

8    my arrest and what I'll continue to do.

9           Since that night, I've been trying very hard to

10   become the best version of myself.  I've deeply devoted myself

11   to intensive therapy, getting on the right medications,

12   acknowledging my destructive relationship with alcohol which

13   has led me to seek out AA and sobriety.  As a result, I'm

14   better equipped to understand and cope and regulate my

15   emotions during times of trauma and grief, anxiety.  Most

16   importantly though, I've connected back much more strongly to

17   my spirituality and my faith.  This has helped my find my path

18   back to redemption and a life led with love.  When I connect

19   back with God, I realize love is really my animating force,

20   not anger or pain.  As part of this reconnection, I've spent

21   time with my imam, who's my spiritual guide.  He's taught me

22   that the most fundamental way of healing is to contemplate and

23   introspect over my own actions, who I am and who I want to be.

24   He's reminded me that it's important to atone for each of my

25   mistakes which is precisely what I've tried to do in these

PROCEEDING                                    23

1    last two and a half years.

2            These two and a half years have really allowed me a

3    lot of room to reflect on who I'm at my very core and try and

4    atone.  I've always strived to lead with love when I promote

5    dignity compassion and justice for others, Your Honor.  I

6    believe that every person should work to heal society, rather

7    than hurt it.  It's not just what I've tried to do in my

8    career, but really what I've tried to do throughout my life,

9    heal a hurting society.  But that's why I'm so sorry and

10   ashamed for not having led with love on the night of May 29th,

11   2020, and that's why I'm so sorry to the NYPD for not only the

12   act of damaging the car, but more importantly, for the larger

13   impact, any distress, animus, ill will, or tension it may have

14   created during an already tumultuous time.

15           I also apologize to my family and friends, most

16   especially my mother, who relies upon me for care and support

17   in her older age after my father passed strategy tragically 10

18   years ago.  My dear mother who's been devastated by this for

19   over two years and has grieved and lost so much -- sorry.

20           THE COURT:  It's all right.  Take your time.

21           MS. RAHMAN:  One of my greatest sorrows has been

22   watching my mother worry about what the future holds for her

23   and for me.  I love her very much.

24           Your Honor, I looked around today at the hallway

25   before we walked into the courtroom and I was overwhelmed with

PROCEEDING                    24

1   so much gratitude for my family, friends, colleagues, who have

2   come in here to support me today.  But there's also a deep

3   shame that they're here because I'm being sentenced for

4   committing a federal crime.  Whatever today's sentencing

5   holds, I promise you I'll not let them down, I won't let you

6   down, Your Honor, and I won't let myself down.  I understand

7   the seriousness of the mistake I've made, but as I said, I'm

8   no longer that person I was two and a half years ago, so I

9   humbly ask you for a second chance, Your Honor, for your

10  compassion and mercy so that I can continue on my path to

11  redemption.  I know deep down I'm a loving person and I

12  sincerely hope you can see that and see how very sorry I am.

13          Thank you for hearing me today.

14          THE COURT:  Thank you, Ms. Rahman.

15          All right.  I'll hear from the Government.

16          MR. RICHARDSON:  Thank you, Your Honor.

17          Your Honor, as the Government has stated in its

18  sentencing memorandum, we're recommending a sentence within a

19  range of 18 to 24 months in custody which is well below the 60

20  months imprisonment recommended by the guidelines.  We've made

21  this recommendation after carefully considering the factors

22  that significantly mitigate the defendant's crime.  Those

23  include her lack of criminal history, her record of employment

24  and service in the public interest, the fact that the

25  defendant targeted an obviously unoccupied vehicle, her

PROCEEDING                    25

1    acceptance of responsibility for her crime, including her

2    commitment to pay back the NYPD for the destruction to that

3    vehicle, and the aberrational nature of her conduct.  And in

4    particular, the Government's investigation has determined that

5    before the night of May 29th, 2020, there is no evidence that

6    the defendant had planned or conspired to engage in any

7    violence against police.

8            THE COURT:  Still, I'm drawn to that comment she

9    made, I think it was that morning, early on that morning

10   before there was any drinking or anything else.  I think that

11   was when she said, need to burn all the police stations down,

12   probably all the courts too.

13           MR. RICHARDSON:  That's right, Your Honor.  That is

14   the first comment we were able to find that voiced support for

15   harm to the police and to the legal system, and that occurred

16   in the very early morning hours of May 29th, 2020.  And the

17   context that's in the presentence investigate report which is

18   that it was at that time in Minneapolis that there were

19   protestors going in to burn precincts where are the officers

20   who murdered George Floyd had worked.

21           That is the -- that was the first indication we were

22   able to find in this investigation.  There was nothing else.

23   There was no evidence that she was part some group that was

24   committed to harming the police.  Until that point, we found

25   nothing that indicated that she supported violence against the

PROCEEDING                                  26

1    police.

2          But while the factors that I've outlined in the

3    Government's view warrant a below-guidelines sentence, the

4    defendant's crime is a serious one, as everyone acknowledges,

5    and it requires a term of imprisonment that appropriately

6    reflects the seriousness of the offense, ensures just

7    punishment, promotes respect for the law, and affords adequate

8    deterrence to criminal conduct.  The defendant built a Molotov

9    cocktail, a weapon, during a chaotic night in New York City,

10   and used it to target an unoccupied NYPD sedan while NYPD

11   officers struggled to maintain order and protect people and

12   property throughout the City.  We know from the defendant's

13   communications and statements to a journalist an hour before

14   her crime that she did it because she was angry that the

15   police were on the streets doing their jobs that night, and

16   she wanted to force city leaders to pull them back.  Her

17   communications showed that when night fell on May 29, 2020,

18   she exulted in the lawlessness that followed the day's

19   protests.  In text messages to her friends, she sent photos

20   and videos of rioters throwing rocks at police officers and of

21   an NYPD van burning.  She bragged that her rock had struck an

22   officer and that there were, quote, Molotovs rolling.

23          Experience teaches us that when anger drives

24   citizens to the streets to exercise their Constitutional right

25   to peaceful protest, it can also drive some to lawless and

1   violent action.  As a public-interest lawyer, the defendant

2   should have known, better than most, that the tools of social

3   change lie in our Democratic form of government and in the

4   legal system that serves and protects it.  And as a lawyer,

5   she swore an oath to uphold the law.  But we are here today

6   because she ignored her training and her professional identity

7   to express her anger in a destructive way.  The sentence the

8   Court imposes today must send a message, that even righteous

9   anger can not never be an excuse for lawless action, and the

10  sentence must promote respect for the law by ensuring the

11  defendant is justly punished for targeting law enforcement.

12         The Government submits that a sentence of

13  imprisonment within the 18 to 24 month range recommended by

14  the Government would be a serious sentence for serious a crime

15  and it would appropriate punishment for this defendant.

16         THE COURT:  I need a few minutes.  Let's reconvene

17  at 11:15, please.

18         (A recess was taken.)

19         THE COURTROOM DEPUTY:  All rise.

20         (Judge BRIAN M. COGAN enters the courtroom.)

21         THE COURT:  Be seated.

22         This is a very difficult, and for me, personally,

23  unpleasant sentence.  Not that they're ever pleasant, but this

24  one is particularly unpleasant.

25         I've considered all of the 3553(a) factors.  Those

1    are the factors and the law that I have to consider in

2    deciding what the right sentence is.  I want to start by

3    emphasizing, as I suggested before, that the guidelines are

4    not a factor.  I have considered them, as I'm required to do,

5    but they really -- they're just not realistic for this crime

6    and this defendant.  So they're playing no role in the

7    sentence.  I would give the same sentence regardless of what

8    the guidelines were.

9              The first factor that's listed in the statute --

10   which doesn't mean it's the most important, it's just one

11   factor like any other factor -- is the nature of the crime and

12   the circumstances of the offense.  Now, Ms. Rahman, I'm going

13   to say a few things about this which I suspect you would fully

14   agree with me at this point in your life and with the changed

15   person you've become, but I have to articulate them because it

16   is one of the elements in the crime that is important to me in

17   determining the appropriate sentence.

18             I think it's clear to you, you know, that we're not

19   just talking about the value of a police car.  That's not what

20   is at issue here.  What you did was an attack on the rule of

21   law.  You know it now, I have no doubt you know it now.  But

22   that's what it was, and in assessing the nature and

23   circumstances of the offense, I have to consider it that way.

24   Now, you well know now that if you think there are grave

25   injustices in society, and there certainly are, you go to the

PROCEEDING                           29

1   ballot box, not the bomb.  It's the United States of America,

2   we just don't do things that way.  Now, what a bomb does can't

3   be undone, unlike what a legislature or an elected official

4   does, and because of that, when a person turns to the bomb to

5   express their dissatisfaction, it's really -- it displays an

6   amazing level of arrogance, and that's what you demonstrated

7   on that night.  It's like there's no good answer, except the

8   one I think is the best answer, and that's what I'm going to

9   do, I'm going to do it with finality, and once I destroy this

10  vehicle and make these violent acts, no one's going back from

11  that.  And it's just a very arrogant way to think.  I mean,

12  one of the things that has tortured me about this sentence is

13  -- again, most sentences, but this one more than others is,

14  what if I'm wrong, what if I'm wrong, and you always have to

15  allow the possibility that you're wrong.  The bomb doesn't let

16  you do that.

17           I've also considered in assessing the nature and

18  circumstances of the offense, the argument and mitigation that

19  no one was in the police car, a window was already shattered,

20  so it was already a damaged vehicle.  I suppose that's a

21  better circumstance than the one that Judge Irizarry had

22  earlier this week where someone through a Molotov cocktail

23  into a police vehicle occupied with police officers.  So it's

24  worth something.  I'm taking it into account.

25           On the other hand, the reason people throw Molotov

PROCEEDING                                    30

1   cocktails into cars is because the car is, itself, a potential

2   bomb.  I mean, you're talking about a vehicle that contains 15

3   or 16 gallons of gasoline.  So it's pretty dangerous to do

4   that.  You can't throw a Molotov cocktail in a car without --

5   not hoping, expecting, or being surprised if there's an

6   explosion.  And once you use the Molotov cocktail to trigger

7   an even bigger bomb, then what you're saying is you're willing

8   to take that risk.  The fact that the street didn't have any

9   people on it at the time, this is New York.  There are not

10  many streets that stay without people on it for long.  There

11  were people put at risk, if no one else, the first responders

12  who had to put the fire out.  But more than that, people who

13  were coming home from a night on the town, people who weren't

14  involved in the demonstration, anybody who could have walked

15  by that potential bomb.

16          And I understand why your lawyer kept saying a few

17  hours.  I view it as a pretty full day, frankly.  I view it

18  as, like, 24 hours.  You know, the video with you keep

19  throwing rocks as them, I threw some rocks and bottles at

20  coppers, rocks missed, bottles didn't, fireworks going and

21  Molotovs rolling.  It seemed like you were having a pretty

22  good time at the time.  I know you feel awful about that now,

23  but at the time, that's what it seemed like.  That makes is

24  more serious to me.  And no one's said anything specifically

25  about throwing rocks and bottles and encouraging other people

1  to throw rocks and bottles.  In a way, that's as bad as the

2  arson.  That's as bad as throwing the Molotov cocktail.  You

3  can kill somebody throwing a rock or a bottle at them.  You

4  know, you've been at places where people throw rocks for

5  effect, they throw rocks to inflict injury or death.  You know

6  that.

7          I'm also not finding too persuasive -- I'm

8  considering it, but I'm not finding too persuasive, the

9  alleged mitigating factor of being drunk.  I think it's fair

10 to say that you probably were.  But, you know, first, it's

11 just not an adequate mitigating factor.  It's not tolerable to

12 get drunk and go do this kind of conduct in what's almost, as

13 I suggested, almost a party atmosphere.  I'm seeing less anger

14 than I am enthusiasm and being caught up in something.

15         And again, I think it's a longer period than a few

16 hours because the morning, the early morning when this

17 happened, you were already saying, need to burn all the police

18 stations down, probably all the courts too.

19         MR. BALDWIN:  Your Honor.

20         THE COURT:  Yes.

21         MR. BALDWIN:  I apologize.

22         THE COURT:  It's okay.  If I've got something wrong,

23 tell me.

24         MR. BALDWIN:  No, no, I don't think it's anything

25 you got wrong, but I know that the Court has emphasized that

PROCEEDING                          32

1    specific point before.  If Your Honor would allow, I just want

2    to respond to that.

3              If you don't want me to, that's fine.

4              THE COURT:  I'm not going to stop you from

5    responding, but I'm telling you I've thought this case over

6    very carefully.

7              Go ahead and tell me what you want to say.

8              MR. BALDWIN:  All I would say to that is obviously

9    we understand, we see the words, we're not disputing the

10   words.  Totally regrettable and unfortunate.

11             THE COURT:  I understand the words are not the

12   deeds, right.  The words are the enthusiasm at what's happened

13   later, that was the deeds.  I got that.  But it does show,

14   like we a say in entrapment cases, a predisposition uncreated

15   by law enforcement.

16             MR. BALDWIN:  All I would say, Your Honor, is

17   that -- and I understand that as we sit here now, this sounds

18   to be a self-serving explanation, but those early texts about

19   burning it down, that was meant in a figurative way.  It

20   wasn't meant literally.  And what I can say is for the

21   several-hour period of time between that text was sent and

22   then the evening when other disturbing and problematic texts

23   were sent, there was a whole host of conversation between

24   Ms. Rahman and others that had nothing to do with the actions

25   that were done that evening.  And so I obviously understand

PROCEEDING                                    33

1    it.  I just would want to note that our position would be that

2    the words were not meant literally and, you know, there was no

3    24-hour plan.  We totally understand and we're not trying to

4    minimize it --

5                THE COURT:  I understand that the plan developed

6    much later and in the course of a few hours.  I think we're

7    saying the same things, and the only thing I disagree with you

8    on is I can't really take those words as figurative,

9    considering they were made as a Minneapolis police station was

10   burning down, right.  And then you look at what happened

11   later, and while it hadn't been planned by that point, it was

12   the natural culmination of where she started that morning,

13   okay.  That's what I'm finding as one of the aggravating

14   factors on nature of the offense and the circumstances of the

15   offense.

16              The only two other aggravating factors I find in the

17   nature of the offense and the circumstances of the offense is

18   that, you know, she also tried to get somebody else to throw

19   the bomb.  Was unsuccessful.  In addition, there was another

20   Molotov cocktail in the van intended for use.  There were the

21   fixings to make more bottles, gas, wicks.  That's kind of

22   activating too.  I'm very glad and I know she's very glad that

23   it stopped where it stopped, but it could have got much worst,

24   and at that point, she was so caught up, she wanted it to go

25   much worse.

PROCEEDING                                34

```
 1              Let me turn to another factor that's extremely
 2    important to me.  And I want to note that I'm not ticking off
 3    all the factors in the statute.  I said I've considered them,
 4    I did consider them.  I'm talking about the ones that I think
 5    are most important.  And another one that I think is very
 6    important statute requires me to consider the history and
 7    characteristics of the defendant.  For the most part, for
 8    reasons that counsel has stated, for reasons that both counsel
 9    have stated, they weigh very heavily in the defendant's favor.
10    Now, she comes here from Pakistan at age four, not with a
11    wealthy family, she does well enough to go to Fordham
12    University and Fordham Law School which has produced many
13    outstanding lawyers, and it's clear from when she was in high
14    school, if not earlier, that she wanted to practice public
15    interest law.  That's laudable.  That is something I can't
16    overstate the importance of in assessing her history and
17    characteristics.  Not that there's anything wrong with lawyers
18    who to go and make money, we need those lawyers too, but it is
19    really commendable that from an early age, she wanted to help
20    the disenfranchised, and that's very powerful to me, that
21    that's what she wanted to do with her life, that her
22    aspirations were to help people, not make money.
23              And Ms. Rahman, I've noted that you did this all
24    over the world, not just here.  I mean, every place, you know.
25    Your travels for helping the disenfranchised are amazing.
```

PROCEEDING                                    35

1    I've never heard of anyone doing anything like this, going to

2    trouble spots wherever people were and trying to help them as

3    a lawyer.  I just want commend you enough for that.  And I'm

4    recognizing its especially commendable because of all the

5    obstacles you had to overcome to get where you wanted to go.

6    You know, I'm not going to go into detail on the public

7    record.  You know what I'm talking about.  Your lawyer alluded

8    to some of them.  All I can say is, for you to rise above all

9    those obstacles and to get where you got, you're a remarkable

10   person who did a terrible thing on one night.

11           I looked carefully at the extraordinary number of

12   character references.  The one that I think carried a lot --

13   and there are there were a lot that carried weight with me.

14   But one that I think carried the most weight was from Dean

15   Feerick, which of course, when he was contacted by other law

16   students and asked to sign a petition in your favor, he

17   declined to do that.  I mean, what dean of a law school

18   wouldn't decline to do that?  The last thing they'd want is to

19   trumpet the fact that their law school produces people who

20   though Molotov cocktails, so I understand why he rejected that

21   opportunity.  But I think it's equally remarkable that once he

22   met with you, he's willing to take that heat -- and pardon the

23   pun.  You know, he thought about you the same way that I think

24   your lawyers and I and even the Government think about you,

25   just a remarkable person who did a terrible thing.

PROCEEDING                                    36

1            All I can say is I read the psychiatric report.  I

2       think it's generally correct as to how you got into this.

3       Somehow, as you said, you lost your way.  You know, you forgot

4       that we're not in the West Bank and we're not in Belfast

5       during the troubles, we're in the United States of America,

6       and that's how we solve problems, not with Molotov cocktails.

7            And then, of course, the thing that makes your

8       character most commendable, the way you used your law degree,

9       also serves as an aggravating factor, because what did you

10      think you were doing, right.  You swore an oath to uphold the

11      Constitution, and I don't think you thought about that.  I

12      think you were too taken up with everything and you didn't

13      think what it -- the seriousness of what we do here in Court

14      every day.  You knew it.  There's no one, you knew it.  You

15      took the oath, you meant it when you took it.  You realize now

16      you should have adhered to a oath.  But violating it as a

17      lawyer, that doesn't reflect well on your history and

18      characteristics.  But like I said, overall, you're a fine

19      person who did a terrible thing.

20           The last of the factors in the statute that stands

21      out to me -- and it's very unusual that two does -- is general

22      deterrence.  If I had have just sentenced you, Ms. Rahman, it

23      would be a lesser sentence without considering general

24      deterrence.  You know, I have to -- I'm not worried about

25      deterring you.  You're not going to do anything like this

PROCEEDING                                    37

 1   again.  You're not going to Jay walk again, I'm convinced of

 2   that.  But there's other people out there for whom two weeks

 3   or a month in the county jail after a protest is a badge of

 4   honor.  There's other people who are on the margins of

 5   protests who can slip into the same kind of mentality that you

 6   did, and I have to speak to those people.  I have to send a

 7   signal to them that says this is not tolerated in a civilized

 8   country.  This is not tolerated in the United States of

 9   America.

10          When I combined all of those factors and the

11   balancing exercise is extraordinarily difficult, I'm going to

12   find that the appropriate sentence is 15 months custody, two

13   years of supervised release.  It will be a condition of

14   supervised release that you comply with your restitution

15   obligation in the amount of $30,137.  That's to be paid to the

16   Clerk of the Court.  It's due and payable immediately.  I'm

17   going to make that -- unless something strange happens, I'm

18   going to make that obligation joint and several with

19   Mr. Mattis when I sentence him in about a month.  There's also

20   a forfeiture of, essentially, the bomb-making materials.

21   There's a forfeiture order that I've signed.  I'm not going to

22   impose a fine because I know it's going to be hard for you to

23   pay for what you need to pay for the restitution, and I'd

24   rather have the money go to the restitution.  I should mention

25   that it should be paid to the Clerk of the Court, and the

PROCEEDING                                     38

1    clerk will distribute it to the NYPD as it comes in.

2           There were a number of other personally directed

3    proposed conditions of supervised release that, as I said at

4    the beginning of the sentencing, I had published for your

5    lawyer and your review.  I'd like to just incorporate those by

6    reference, rather than reading them, because they're long and

7    detailed.

8           I just want to make sure, Ms. Rahman, you're

9    familiar with those details?

10          MS. RAHMAN:  Yes, Your Honor.

11          THE COURT:  I am incorporating those special

12   conditions of supervised release as if fully pronounced here

13   in court.

14          I will impose, of course, the mandatory 100-dollar

15   special assessment.

16          Anything I missed?  We have an underlying

17   indictment.

18          MR. RICHARDSON:  Your Honor, at this time, the

19   Government moves to dismiss the underlying document.

20          THE COURT:  All right.  That's granted.

21          Here's what I propose on a reporting dated, tell me

22   if this sits well with you.  I'm prepared to be elastic about

23   the reporting date.  I don't want her showing up at the MDC.

24   She may get designated to the MDC because the sentence is not

25   all that long, but I'd like to just set a surrender date for

PROCEEDING                                    39

1    about six weeks from now.  If she hasn't been designated by

2    then, you'll write me a letter, and I'll extend that until she

3    is designated.  There's no reason for her to have to move from

4    facility to facility.

5             MR. BALDWIN:  Your Honor, if you would just see fit

6    to make it, potentially, eight weeks which would get us in

7    instead of the end of the year and the holidays, if we could

8    just do middle of January.  It would also allow Ms. Rahman

9    time to ensure that her mother's care is taken care of.

10   Hopefully, that's not too much longer than the Court was

11   considering.  But if the Court would consider a mid January

12   date, and obviously, to the extent that there's not a

13   designation by that point in time, we'll alert the Court and

14   if Your Honor also would consider it, we'd respectfully

15   request if you would make a recommendation for Danbury.

16             THE COURT:  Okay.  First, as to the surrender date,

17   does the Government have any problem with January 15th?

18             MR. ALGOR:  No, Your Honor.

19             THE COURT:  January 15th is the surrender date.

20             I certainly will make a strong recommendation to

21   Danbury because I have seen here how important her support

22   network is, and I think having her in a far off prison would

23   not do her any good at all.  So I will enthusiastically -- I

24   can't command it, but I can certainly recommend to the Bureau

25   of Prisons, and I know from my experience, they try to comply

PROCEEDING                           40

1   with judicial recommendations when there's a reason basis to

2   do that.

3            All right.  Did her plea agreement have an appeal

4   waiver?

5            MR. RICHARDSON:  It does, Your Honor.

6            MR. BALDWIN:  It did.

7            THE COURT:  Okay.  So Ms. Rahman, you have, in your

8   plea agreement, by pleading guilty, given up your right to

9   appeal your conviction.  You've also given up your right to

10  appeal the sentence that I have imposed.  However, if you

11  think there was something fundamentally wrong about any phase

12  of these proceedings and you think your conviction has any

13  legal grounds at all on which to be challenged or the sentence

14  that I imposed is in in any way improper, you can, at least,

15  attempt to appeal that.  If you want to appeal, you have to

16  get a notice of appeal -- I know you know what that is --

17  filed within 14 days.  You can have your lawyer do it.  I'm

18  sure they'll be happy to.  You can do it yourself.  It's a

19  one-page form or you can certify to the Clerk of the Court

20  that you can't afford a lawyer, and the clerk will do it.  But

21  no matter how you delegate it, it remains your responsibility

22  to see that it gets filed within 14 days, or you will have

23  irrevocably waived any right to appeal that you might have.

24           Anything further?

25           MR. RICHARDSON:  Not from the Government, Your

PROCEEDING                                    41

1    Honor.

2              MR. BALDWIN:  Not from the defense.  Thank you, Your

3    Honor.

4              THE COURT:  All right.  Good luck to you,

5    Ms. Rahman.

6              MS. RAHMAN:  Thank you, Your Honor.

7

8              (Whereupon, the matter was concluded.)

9

10                     *     *     *     *     *

11

12

13   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

14

15        s/ Avery N. Armstrong          November 30, 2022
          AVERY N. ARMSTRONG                    DATE

16

17

18

19

20

21

22

23

24

25

*AVERY N. ARMSTRONG, RPR*
*OFFICIAL COURT REPORTER*